**Eileen M. McCARTHY, Plaintiff, Appellant,**

v.

**NORTHWEST AIRLINES, INC., Defendant, Appellee.**

No. 94–2282.

United States Court of Appeals, First Circuit.

Heard May 1, 1995.

Decided May 31, 1995.

Marvin H. Greenberg, with whom Bonnie L. Karshbaum, Woburn, MA, was on brief, for appellant.

Patricia A. Wilson, with whom John J. Bonistalli, Boston, MA, was on brief, for appellee.

Before SELYA and CYR, Circuit Judges, and COFFIN, Senior Circuit Judge.

SELYA, Circuit Judge.

Following an accident that occurred in the course of international air travel, plaintiff-appellant Eileen M. McCarthy filed a suit for damages against defendant-appellee Northwest Airlines, Inc. (Northwest). Concluding that the Warsaw Convention stood in the way, the district court grounded the suit. *See McCarthy v. Northwest Airlines, Inc.*, 862 F.Supp. 17 (D.Mass.1994). Plaintiff appeals. We affirm.

## I. BACKGROUND

Because the district court granted summary judgment in the defendant's favor, we array the material facts in a way that puts the best face on the plaintiff's claims without distorting them.

On July 2, 1990, the plaintiff and her sister departed Boston via Northwest en route to the Orient. They flew to Tokyo and stayed for four days. At that point their itinerary called for them to fly to Osaka and then on to China. The sisters repaired to the airport and, since they had not yet obtained boarding passes, they joined a queue that had formed at the Northwest ticket counter.

When the sisters reached the desk, they expressed uncertainty about whether time had grown too short. The plaintiff claims that they told the Northwest ticket agent that they were perfectly willing to take a later flight in order to avoid rushing. The agent brushed aside their concerns, tagged their luggage, issued boarding passes, and led them "at a fast trot" in the general direction of the customs area. Still following the agent (who retained possession of their passports, tickets, and boarding passes), the sisters took an escalator accessible to the general public from one level of the terminal building to a lower level. The escalator malfunctioned and McCarthy fell.

Although the plaintiff sustained an injury, she proceeded through customs, entered a bus that drove her to the approximate point of departure, and thereafter boarded the airplane that took her to Osaka. She continued on to China as she had planned. Upon her return to the United States, she consulted a physician who determined that she had broken her knee. The doctor's diagnosis led to both a lengthy convalescence and a suit for damages.[1]

## II. THE SUMMARY JUDGMENT STANDARD

Summary judgment has a special niche in civil litigation. Its "role is to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 794 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113

---

1. McCarthy originally sued Northwest on both negligence and strict liability theories. Following an adverse ruling in the district court, she abandoned the negligence claim. Consequently, her appeal concerns only her strict liability claim.

S.Ct. 1845, 123 L.Ed.2d 470 (1993). The device allows courts and litigants to avoid full-blown trials in unwinnable cases, thus conserving the parties' time and money, and permitting courts to husband scarce judicial resources.

A court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). We have discussed this rule in a cascade of cases, *see, e.g., Coyne v. Taber Partners I*, 53 F.3d 454, 457–58 (1st Cir.1995); *National Amusements, Inc. v. Town of Dedham*, 43 F.3d 731, 735 (1st Cir.1995), *cert. den.*, —— U.S. ——, 115 S.Ct. 2247, 132 L.Ed.2d 255 (1995); *Pagano v. Frank*, 983 F.2d 343, 347 (1st Cir.1993); *Wynne*, 976 F.2d at 794; *United States v. One Parcel of Real Property (Great Harbor Neck, New Shoreham, R.I.)*, 960 F.2d 200, 204 (1st Cir. 1992); *Rivera–Muriente v. Agosto–Alicea*, 959 F.2d 349, 351–52 (1st Cir.1992); *Griggs– Ryan v. Smith*, 904 F.2d 112, 115–16 (1st Cir.1990); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 7–8 (1st Cir.1990); *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 48– 49 (1st Cir.1990), and it would serve no useful purpose to rehearse all the particulars of those discussions. For purposes of this case, it suffices to outline the manner in which the rule operates.

Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists. *See National Amusements*, 43 F.3d at 735. As to issues on which the summary judgment target bears the ultimate burden of proof, she cannot rely on an absence of competent evidence, but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute. *See Garside*, 895 F.2d at 48. Not every

factual dispute is sufficient to thwart summary judgment; the contested fact must be "material" and the dispute over it must be "genuine." In this regard, "material" means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant. *See One Parcel*, 960 F.2d at 204. By like token, "genuine" means that "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party...." *Id.*

When all is said and done, the trial court must "view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor," *Griggs–Ryan*, 904 F.2d at 115, but paying no heed to "conclusory allegations, improbable inferences, [or] unsupported speculation," *Medina–Munoz*, 896 F.2d at 8. If no genuine issue of material fact emerges, then the motion for summary judgment may be granted.

Because the summary judgment standard requires the trial court to make an essentially legal determination rather than to engage in differential factfinding, appellate review of an order granting such a motion is plenary. *See Pagano*, 983 F.2d at 347; *Garside*, 895 F.2d at 48.

## III. DISCUSSION

We bifurcate the body of our opinion. First, we explicate the Warsaw Convention, the etiology of Article 17, and the accepted analytic approach to Article 17 cases. Next, we shine the light of our gleaned understanding on the case before us.

### A. The Legal Landscape.

Generally speaking, the Warsaw Convention, formally known as the Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), note foll. 49 U.S.C. app. § 1502,[2] arose out of

---

**2.** The United States initially adhered to the Warsaw Convention on October 29, 1934. Except as otherwise specifically indicated, however, all references to the Convention in this opinion are to

the document as modified by the Montreal Agreement, formally known as the Agreement Relating to Liability Limitations of the Warsaw Convention and the Hague Protocol, CAB Agreement

a perceived need to provide a fledgling industry with a uniform set of legal rules that would govern accidents occurring in international air travel. Under the Convention, air carriers are absolutely liable, up to a preset monetary ceiling, for any accident in which a passenger suffers bodily injury or death as long as the accident "took place on board the aircraft or in the course of any of the operations of embarking or disembarking." *Id.*, art. 17, 49 Stat. at 3018.

■ "Treaty interpretation is a purely legal exercise," *In re Extradition of Howard*, 996 F.2d 1320, 1329 (1st Cir.1993), but the terms "embarking" and "disembarking" as used in this treaty are less than mathematically precise. Just as legislative history can inform the meaning of an inexact statute, however, so, too, can the history of a treaty inform its meaning. *See Cook v. United States*, 288 U.S. 102, 112, 53 S.Ct. 305, 308, 77 L.Ed. 641 (1933). Thus, we look back in time to gain a better comprehension of the language that the drafters employed.

The Warsaw Convention was the product of ponderous deliberation. Conferees who met in Paris in 1925 appointed a committee of experts, the Comité Internationale Technique d'Experts Juridique Aériens (CITEJA), to prepare a suggested accord. CITEJA's recommendations were considered at a second conference, held in Warsaw in 1929. CITEJA recommended extending accident coverage to passengers "from the time [they] enter the airport of departure until the time when they exit from the airport of arrival." Minutes, Second International Conference on Private Aeronautical Law, October 4–12, 1929, Warsaw 171 (R. Horner & D. Legrez trans. 1975) (Warsaw Minutes). The breadth of the proposed language inspired heated debate. *See, e.g.,* Warsaw Minutes at 49; *see also Day v. Trans World Airlines, Inc.*, 528 F.2d 31, 35 (2d Cir.1975) (reviewing history of Article 17), *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976).

In an effort to accommodate conflicting views, a French delegate, Prof. Georges Ripert, suggested that the article should "employ a general formula 'during air carriage' in leaving to the courts the duty of deciding in each case if one is within the contract of carriage." Warsaw Minutes at 73; *see also Martinez Hernandez v. Air France*, 545 F.2d 279, 283 (1st Cir.1976) (discussing Ripert proposal), *cert. denied*, 430 U.S. 950, 97 S.Ct. 1592, 51 L.Ed.2d 800 (1977). The delegates embraced Ripert's idea, *see* Warsaw Minutes at 83, and the drafting committee couched the compromise in substantially the form now embodied in Article 17. *See id.* at 166.

The single substantive issue presented in this appeal is whether plaintiff was injured while "embarking" within the meaning of Article 17. Though the Supreme Court has not yet had occasion to define the words "embarking" or "disembarking" in the context of Article 17, the Court has generally read Article 17 parsimoniously. *See, e.g., Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 552, 111 S.Ct. 1489, 1502, 113 L.Ed.2d 569 (1991) (holding that Article 17 does not allow recovery for harm unaccompanied by some physical manifestation of injury); *Air France v. Saks*, 470 U.S. 392, 406, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985) (adopting restrictive definition of "accident" for purposes of Article 17). This restraint is entirely understandable as Article 17 provides for strict liability, and there are sound policy reasons to confine that liability to the letter of the text, narrowly construed. *See Eastern Airlines*, 499 U.S. at 552, 111 S.Ct. at 1502. The terms "embarking" and "disembarking" are not infinitely elastic, and we believe it is quite probable that, when the occasion to interpret those terms arises, the Court will prove to be similarly restrained in defining them. *Cf. Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122, 128, 109 S.Ct. 1676, 1680, 104 L.Ed.2d 113 (1989) (holding that Article 3(2) deprives a carrier of the Warsaw Convention's Article 3 damages limitation only if the carrier fails to deliver a ticket altogether).

■ Given the historical record and the signals that the Supreme Court has sent, most courts have interpreted the terms "em-

18900, note foll. 49 U.S.C. app. § 1502 (approved by CAB Order E–23680, May 13, 1966, 31

Fed.Reg. 7302).

barking" and "disembarking" to connote a close temporal and spatial relationship with the flight itself. In the process, these courts have found a three-pronged inquiry to be useful. The inquiry focuses on (1) the passenger's activity at the time of injury, (2) his or her whereabouts when injured, and (3) the extent to which the carrier was exercising control at the moment of injury. *See, e.g., Schroeder v. Lufthansa German Airlines*, 875 F.2d 613, 617 (7th Cir.1989); *Evangelinos v. Trans World Airlines, Inc.*, 550 F.2d 152, 155 (3d Cir.1977) (en banc); *Maugnie v. Compagnie Nationale Air France*, 549 F.2d 1256, 1261–62 (9th Cir.1977), *cert. denied*, 431 U.S. 974, 97 S.Ct. 2939, 53 L.Ed.2d 1072 (1977); *Day*, 528 F.2d at 33. We, too, have noted that such considerations are highly relevant in determining the applicability of Article 17. *See Martinez Hernandez*, 545 F.2d at 282. We do not view the three factors—activity, location, and control—as separate legs of a stool, but, rather, as forming a single, unitary base. In the last analysis, the factors are inextricably intertwined. *Cf. Evangelinos*, 550 F.2d at 155 (observing that control "is an integral factor in evaluating both location and activity").

■ What is more, the language of Article 17—which speaks to accidents that occur "in the course of any of the operations of embarking"—strongly suggests that there must be a tight tie between an accident and the physical act of entering an aircraft. *See Martinez Hernandez*, 545 F.2d at 283-84 (concluding that the drafters of the Warsaw Convention understood embarking "as essentially the physical activity of entering" an airplane); *see also Evangelinos*, 550 F.2d at 155. This "tying" concept informs location as well as activity. Consequently, for Article 17 to attach, the passenger must not only do something that, at the particular time, constitutes a necessary step in the boarding process, but also must do it in a place not too remote from the location at which he or she is slated actually to enter the designated aircraft. *See Martinez Hernandez*, 545 F.2d at 283; *Day*, 528 F.2d at 33.

### B. *Analysis.*

In applying these principles to the case at hand, we deem it useful to start by consider-

ing specific examples of accidents that have been found to come within the encincture of Article 17. Perhaps the most venturesome of the reported appellate decisions are *Day* and *Evangelinos*. When passengers had surrendered their tickets, passed through passport control, entered the area reserved exclusively for those about to depart on international flights, and queued up at the departure gate—a prerequisite to boarding—the Second Circuit ruled that they were engaged in performing a necessary step in the boarding process. Thus, Article 17 applied to an ensuing injury. *See Day*, 528 F.2d at 33. Similarly, when passengers "had completed virtually all the activities required as a prerequisite to boarding, and were standing in line at the departure gate ready to proceed to the aircraft" at the time of the accident, the Third Circuit found them to have been engaged in a necessary step in the boarding process. *See Evangelinos*, 550 F.2d at 156. Hence, Article 17 applied.

■ The case at bar is of a significantly different genre. The plaintiff here, unlike the plaintiffs in *Day* and *Evangelinos*, had yet to fulfill most of the conditions precedent to boarding; at the time of the accident, she had not left the common area of the terminal, located the bus that would transport her to the vicinity of her assigned aircraft, reached an area restricted to travelers, nor isolated herself from the throng of other passengers flying to other destinations. In addition, the activity in which the plaintiff was engaged at the time of injury—proceeding on an escalator from one level of the terminal's common area to another—cannot in any sense be seen as comprising a necessary step in the boarding process. In both *Evangelinos* and *Day*, the only way passengers could have entered the designated aircraft was to pass through the departure gate at which the injury occurred. *See Evangelinos*, 550 F.2d at 156; *Day*, 528 F.2d at 33. In sharp contrast, the record in this case does not contain the slightest hint that the plaintiff could *only* have reached her assigned aircraft by taking the particular escalator from which she fell.

Last—but far from least—the accident here, unlike in *Evangelinos* and *Day*, hap-

pened at a considerable distance from the departure gate and well before any actual embarkation was possible. In other words, plaintiff's fall was far removed from the act of embarkation, both temporally and spatially. Most importantly, it took place in a part of the terminal not restricted to passengers. We believe it is no mere happenstance that the plaintiff has not cited—and we have been unable to deterrate—a single instance in which Article 17 has been found to cover an accident that occurred within the public area of a terminal facility.

A typical case is *Buonocore v. Trans World Airlines, Inc.,* 900 F.2d 8 (2d Cir. 1990), in which the court held that, although the plaintiff had checked in at the ticket counter, Article 17 did not cover an ensuing injury sustained in a public area "nowhere near the gate." *Id.* at 10. So, too, in *Rolnick v. El Al Israel Airlines, Ltd.,* 551 F.Supp. 261 (E.D.N.Y.1982), the plaintiffs "had checked their baggage and obtained their boarding passes, but had not yet gone to passport control" when an accident occurred on an escalator within the terminal building. *Id.* at 262–63. On these facts, the court determined that the plaintiffs were not "embarking" within the purview of Article 17.

The disembarkation cases are grouped along a comparable axis. *See, e.g., Maugnie,* 549 F.2d at 1262 (holding Article 17 inapplicable where passenger had deplaned and accident occurred in a common passenger corridor of Orly Airport); *Martinez Hernandez,* 545 F.2d at 282 (holding Article 17 inapplicable where at the time of injury the passengers had traveled by bus or on foot from the aircraft to the terminal); *see also Schmidkunz v. Scandinavian Airlines Sys.,* 628 F.2d 1205, 1207 (9th Cir.1980); *Knoll v. Trans World Airlines, Inc.,* 610 F.Supp. 844, 846–47 (D.Colo.1985).

Although both the nature of the activity and the location of the accident stand as obstacles in her path, plaintiff, relying primarily on a dictum contained in *Martinez Hernandez* (suggesting that "the scope of article 17 should be limited to those situations either where the carrier has taken charge of the passengers, or possibly where it customarily would have done so," 545 F.2d at 283 n. 4), argues that Article 17 is nonetheless available because Northwest had "absolute control" over her once its agent had "confiscated" her passport, ticket, and boarding pass. This attempt to fly over hostile territory ends in a crash landing.

In the first place, after we discard the rhetorical flourishes and focus on the facts, *see, e.g., Medina–Munoz,* 896 F.2d at 8 (warning that "conclusory allegations" are not enough to defeat summary judgment), it becomes readily evident that the plaintiff was not under the airline's "control" in any meaningful sense. McCarthy produced no evidence tending to show that she was obliged to take the escalator on which she fell as a prerequisite to embarking. Likewise, she produced no evidence suggesting that the ticket agent refused a timely request to slow down or to return her travel documents. If the plaintiff did not desire to follow the agent down the escalator "at a fast trot," she had the ability to proceed at her own pace, to take an alternate route, or simply to await a later flight.

In the second place, even were we to conclude that the agent's peremptory instructions, coupled with the possession of plaintiff's travel documents, constituted a kind of "control," this, alone, would not be enough to bridge the moat that surrounds Article 17. If it were, the *Day/Evangelinos* test would be a hoax, for two of its three prongs—activity and location—would be rendered inoperative, and the third—control—would lack the nexus with the others that informed the final version of Article 17. At bottom, plaintiff's activity had only an attenuated connection with entering an aircraft, and it is augmented by nothing more than an indulgent interpretation of control. Thus, these factors cannot overcome the remoteness of the accident site from the aircraft.

In the third place, if the *Martinez Hernandez* dictum is accorded the meaning plaintiff ascribes to it, then it is broadly overinclusive and we reject it. But we think that the plaintiff reads the dictum through rose-colored glasses. After all, the *Martinez Hernandez* court held that Article 17 did *not* apply on the facts of that case, *see* 545 F.2d at 282, and this holding indicates that the

court never intended to throw open the gates of Article 17 as widely as McCarthy suggests. Nor has any other court done so.[3] We will not be the first.

## IV. CONCLUSION

Having dismissed the notion that the *Martinez Hernandez* dictum demands a repudiation of the result reached by the court below, we taxi toward the hangar. Scrutinizing the evidence of record in the ambience most soothing to the plaintiff, and applying settled legal principles, a rational jury could not find that, at the time of the injury, McCarthy was "embarking" within the purview of that term as it is used in Article 17 of the Warsaw Convention.

We need go no further; the lower court appropriately granted Northwest's motion for *brevis* disposition.

*Affirmed.*

3.  To be sure, a somewhat similar dictum is found in *Knoll*, where the court wrote of judicial reluctance to extend coverage under the Warsaw Convention "to injuries incurred within the terminal, *except in those cases in which plaintiffs were clearly under the direction of the airlines.*" *Knoll*, 610 F.Supp. at 846 (emphasis supplied). But in *Knoll*, as in *Martinez Hernandez*, the court's holding belies the implication that McCarthy seeks to derive from it. To be specific, the court held that Knoll was not embarking where, after airline agents advised passengers to proceed to immigration, she slipped as she approached that area. *Id.* at 847. In so holding, the court stressed that the many activities yet to be performed, *e.g.*, proceeding through immigration and customs, were not conditions imposed by the airline, but, rather, were conditions imposed by the host country in which plaintiff was traveling. *See id.*