Sherri **KELLEY,** Plaintiff,

v.

**MAINE EYE CARE ASSOCIATES, P.A.,** Defendant.

No. CIV. 98–176–B.

United States District Court, D. Maine.

March 24, 1999.

48

Michael J. Schmidt, Wheeler & Arey, P.A., Waterville, ME, Plaintiffs.

Richard G. Moon, Moon, Moss, McGill & Bachelder, P.A., Portland, ME, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

BRODY, District Judge.

Plaintiff Sherri Kelley ("Plaintiff") alleges that her employer, Defendant Maine Eye Care Associates, P.A. ("Defendant"), fired her from her position as an optical lab technician because of her membership in the United States Army Reserves in violation of the Uniform Services Employment and Reemployment Rights Act, 38 U.S.C. §§ 4301–4333 ("USERRA"). Defendant denies this allegation and counterclaims that Plaintiff filed the present action in violation of a settlement agreement between the parties. Specifically, Defendant's Counterclaim asserts claims for declaratory judgment (Count I), specific performance (Count II), breach of contract (Count III), and equitable and promissory estoppel (Count IV). Before the Court are Defendant's Motion for Summary Judgment on Plaintiff's Complaint and Cross Motions for Summary Judgment on all Counts of Defendant's Counterclaim. For the reasons set forth below, Defendant's Motion for Summary Judgment on Plaintiff's Complaint is DENIED. Plaintiff's Cross Motion for Summary Judgment on Defendant's Counterclaim is GRANTED as to Count IV. The parties' Cross Motions for Summary Judgment on Defendant's Counterclaim are DENIED as to all other Counts.

## I. SUMMARY JUDGMENT

Summary judgment is appropriate in the absence of a genuine issue as to any material fact and when the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). An issue is genuine for these purposes if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A material fact is one that has "the potential to affect the outcome of the suit under the applicable law." *Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). Facts may be drawn from "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits." Fed.R.Civ.P. 56(c). For the purposes of summary judgment the Court views the record in the light most favorable to the nonmoving party. *See McCarthy v. Northwest Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir.1995).

## II. BACKGROUND

Plaintiff was employed by Defendant as optical lab technician from October 1997 until her discharge on March 10, 1998.[1] She was hired by Clinic Administrator George Edmondson ("Edmondson") and supervised by Jayne Dunlap ("Dunlap") and Michele Perkins ("Perkins").

Plaintiff's performance during her approximately four month tenure with Defendant is in dispute. Defendant claims

---

1. Except where noted, all relevant events occurred in 1998.

that Plaintiff was late or absent on an unacceptable number of occasions and had poor lab skills, including a relatively high "breakage" rate.[2] Defendant asserts that a breakage report prepared after Plaintiff's termination and notations on Perkins's desk calendar regarding Plaintiff's attendance support its assessment of Plaintiff's performance. Defendant admits, however, that Plaintiff's supervisors never notified her of these or any other work-related problems.

Plaintiff claims that no one informed her of alleged performance problems because, in fact, there were no problems. She points out that Defendant's Employee Manual provides that employees should receive a verbal or written warning regarding performance problems prior to termination. Plaintiff also notes that Defendant produced no records documenting her attendance, despite its practice of requiring employees to use time cards. In addition, she disputes the accuracy and proper interpretation of Defendant's breakage report, and observes that it was prepared after her termination in preparation for litigation.

In any event, on the morning of March 10, Plaintiff notified Dunlap that she had joined the Army Reserves and presented her with a training schedule requiring her to miss approximately two weeks of work in April. Later that day, Edmondson fired Plaintiff.

According to Defendant, Plaintiff's termination was the culmination of a decision-making process that began on January 26 at a meeting between Edmondson, Dunlap, and Perkins. The three voted 2 to 1 to fire Plaintiff based on their concerns about her attendance and lab skills. Shortly thereafter, however, Dunlap, who had voted to terminate Plaintiff, changed her vote and the three decided to monitor Plaintiff's performance for improvement rather than discharge her immediately. On February 23, Edmondson, Dunlap and Perkins met again and determined that Plaintiff's performance had not improved. They then decided that Edmondson would fire Plaintiff on either February 28 or March 2. Defendant claims that Edmondson's schedule did not allow him to meet with and discharge Plaintiff until March 10. Defendant further claims that Edmondson had no knowledge of Plaintiff's military affiliation at the time he fired her.

In sharp contrast to Defendant's version of events, Plaintiff contends that no vote to terminate her was conducted on January 26 and that the alleged February 23 meeting never took place. With regard to the alleged January 26 vote, Plaintiff points to a notation on Perkins's desk calendar which indicates that the vote concerned a January 30 performance review of Plaintiff, not her termination. As for the alleged February 23 meeting, Plaintiff highlights Perkins's deposition testimony that, unlike other significant work-related events, the meeting was not recorded on her desk calendar. In addition, Plaintiff notes that she was not fired until two weeks after the decision to discharge her allegedly was made, despite Edmondson's admission at his deposition that he was at Plaintiff's work site on one occasion between February 23 and March 10.

Plaintiff also challenges Defendant's assertion that the decision to fire her was based on her lack of improvement since Edmondson testified at his deposition that he did not know whether her performance had improved and Perkins testified at her deposition that Plaintiff's attendance, in fact, had improved after January 26. In addition, Plaintiff asserts that Edmondson was aware of her membership in the Army Reserves before he fired her based on the deposition testimony of both Dunlap and Edmondson that he had spoken with Dunlap on March 10 after Dunlap's meeting with Plaintiff and prior to Plaintiff's discharge.

Following her termination, Plaintiff filed a complaint with the Department of Labor

2. "Breakage" refers to lenses accidentally broken in the lab.

("DOL") by letter dated March 17. On April 9, DOL Investigator John Guay ("Guay") conducted a hearing on Plaintiff's complaint. On April 16, Guay notified Defendant that he found Plaintiff's USERRA claim meritorious.

Some time after issuing his finding, Guay broached with Plaintiff the possibility of a settlement proposal.[3] On May 21, Guay transmitted a settlement proposal from Plaintiff to Defendant which stated that Plaintiff would agree to settle in exchange for a lump sum payment of $3,000 and a letter of recommendation subject to her approval. By fax letter dated May 22, Defendant responded that it would give Plaintiff $1,500 and a letter of reference subject to her approval "in complete and full settlement of all claims," including the USERRA claim and "any and all other claims." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 5.) Defendant's May 22 letter further specified that "the settlement agreement should include a complete general release or there needs to be an additional separate release." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 5.)

On June 1, Guay informed Defendant by letter that Plaintiff had agreed to "accept the counter offer made by [Defendant]" in its May 22 letter.[4] (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 6.) Specifically, Guay stated that "the counter offer [Plaintiff] has agreed to accept is a check in the lump sum amount of $1,500 (no taxes or deductions withheld), and a letter of recommendation from [Defendant] which she will preapprove." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 6.) Attached to Guay's June 1 letter was a one-page "Settlement Agreement" for Defendant's signature which specified that Defendant agreed to (1) pay Plaintiff $1,500 and (2)

give Plaintiff "a letter of recommendation." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 7.) The settlement draft further stated that "in consideration of receiving a check in the amount of $1,500 (no deductions) and the letter of recommendation, [Plaintiff] agrees to release successors from any kind of liabilities, demands, damages, and courses of action arising out of this claim." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 7.) Guay invited Defendant to make changes to the settlement draft and stated that he would "consider incorporating [them] into [the] agreement." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 7.)

On June 3, Defendant sent Guay a four-page document entitled "Settlement Agreement and General Release" which, in addition to the terms contained in Guay's June 1 "Settlement Agreement," also included clauses concerning confidentiality, non-disparagement, and re-employment.

On June 10, Guay received from Defendant a letter of reference for Plaintiff dated May 26 and a check made out to Plaintiff in the amount of $1,500. In an attached letter, Defendant's counsel requested that Guay "hold the settlement check and original reference letter in escrow until you have received the signed and notarized settlement agreement from [Plaintiff]." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 11.) On that same day, Guay informed Defendant by letter that Plaintiff intended to seek legal advice before signing Defendant's Settlement Agreement and Release. Guay also conveyed Plaintiff's dissatisfaction with the letter of reference along with requested changes. On June 12, Defendant sent a revised letter of ref-

---

**3.** According to Guay's May 21 letter to Defendant, Defendant had told Guay on May 18 that it was willing to consider some type of monetary settlement and a letter of reference.

**4.** Guay's June 1 letter refers to an earlier, presumably oral, communication between himself and Defendant on May 26 during which he informed Defendant that Plaintiff would "accept the counter offer of [Defendant]."

erence to Guay incorporating Plaintiff's requests.

On July 27, Guay was notified by Michael J. Schmidt that Plaintiff had retained his law firm to pursue her case in United States District Court, and that she no longer wanted Guay to submit her complaint to the United States Attorney. On July 28, Guay returned the unendorsed settlement check to Defendant's counsel. Plaintiff filed the present action in this Court on August 25.

At her deposition on December 21, Plaintiff for the first time informed Defendant that she was unhappy with the revised version of the reference letter. During the deposition and at Defendant's request, Plaintiff drafted an acceptable reference letter. Defendant maintains that it was and continues to be willing to sign this version of the reference letter.

## III. DISCUSSION

In response to Plaintiff's claim that Defendant discharged her because of her membership in the Army Reserves, Defendant counterclaims that Plaintiff had agreed to settle the case and breached that agreement by filing suit in federal court. Defendant seeks various forms of relief, including specific performance of the settlement agreement, declaratory relief, and compensatory damages. Since a finding concerning the settlement agreement is potentially dispositive, the Court will consider the parties' Cross Claims for Summary Judgment on Defendant's Counterclaim before addressing Defendant's Motion for Summary Judgment on Plaintiff's Complaint.

### A. Settlement Agreement

In support of its Counterclaim that Plaintiff breached the parties' settlement agreement, Defendant argues that a binding agreement was formed when Plaintiff, through Guay's June 1 letter, communicated her assent to Defendant's May 22 counteroffer of $1,500, a preapproved letter of reference, and a release of all claims. Defendant urges the Court to regard its provision to Guay of a draft Settlement Agreement and General Release, as well as a $1,500 check and draft letter of reference, as the beginning of its performance of the agreement.

Plaintiff responds that despite the statement in Guay's June 1 letter that Plaintiff "accepted" Defendant's counteroffer, the letter did not constitute her final assent, but rather was part of a continuing negotiation. Plaintiff argues that both parties intended to be bound only upon the execution of a written settlement agreement and since no such document was ever signed by her or Defendant, her suit does not constitute a breach.

It is clear from the parties' Motions that the critical issue in this case is whether a settlement contract was formed when, on June 1, Plaintiff responded positively to Defendant's May 22 counter offer.[5] "Parties do not become contractually bound until they mutually assent to bind themselves to an agreement." *Salem Laundry Co. v. New England Teamsters & Trucking Indus. Pension Fund*, 829 F.2d 278, 280 (1st Cir.1987). In determining whether or not there was mutual assent, the intent of the parties is dispositive. *See Masselli v. Fenton*, 157 Me. 330, 172 A.2d 728, 730 (Me.1961). However, intent is assessed "not on the basis of what goes

5. The Court notes that an issue may exist as to whether federal common law or Maine law governs the formation of contracts to settle claims brought under federal law. *See, e.g., Bowden v. United States*, 106 F.3d 433, 439–40 (D.C.Cir.1997) (discussing whether District law or federal common law of contract governs settlement of Title VII claim); *Ciaramella v. Reader's Digest Assoc., Inc.*, 131 F.3d 320, 322 (2d Cir.1997) (finding identical outcome whether New York or federal common law of contracts governs settlement of claims under ADA and ERISA). The Court has found no case considering this question in the context of a USERRA claim. Since both parties have assumed, without discussion, that Maine law applies, the Court declines to address the issue.

on inside the parties' heads, but rather on the basis of what they say and do." *Salem Laundry Co.*, 829 F.2d at 280. Factors bearing on intent include:

> whether the contract is of that class which are unusually found to be in writing, whether it is of such nature as to need a formal writing for its full expression, whether it has few or many details, whether the amount involved is large or small, whether it is a common or unusual contract, [and] whether the negotiations themselves indicate that a written draft is contemplated as the final conclusion of the negotiations.

*Mississippi & Dominion Steamship Co. v. Swift*, 86 Me. 248, 29 A. 1063, 1067 (Me. 1894). In this case, the existence of a genuine issue of fact as to when the parties intended to be obligated to perform precludes the Court from granting summary judgment to either party.

On one hand, a reasonable jury could find that the parties intended to be bound to the terms expressed in Defendant's May 22 counteroffer and that "a written draft [was] viewed by the parties merely as a convenient memorial or record of their previous contract." *Id.* Plaintiff's intent to be bound in the absence of a written contract is evidenced by Guay's June 1 letter which stated that Plaintiff "accept[s]" Defendant's "counter offer," the terms of which were "a check in the lump sum amount of $1,500 . . . and a letter of recommendation . . . which [Plaintiff] will pre-approve." Though Guay's letter made no reference to the general release that was an explicit term of Defendant's counteroffer, the draft Settlement Agreement attached to the letter stated that Plaintiff "agrees to release successors from any kind of liabilities, demands, damages, and courses of action arising out of this claim." Likewise, Defendant's intent to be bound in advance of a formal written agreement is supported by evidence that it began to perform its obligations by providing Plaintiff with a $1,500 check and completing two drafts of a letter of reference.

On the other hand, there is compelling evidence that one or both of the parties did not intend to be bound until the execution of a final written agreement. First, and perhaps most important, both parties expressed their understanding that Guay would hold Defendant's settlement check and letter of reference until Plaintiff had signed a settlement agreement and release. Second, the draft settlement proposals exchanged by the parties reflect different conceptions of the term "general release," indicating that neither intended to be bound until the terms and language of the release were finalized in writing.[6] Third, the notion that the reference letter was to be "preapproved" suggests that Plaintiff did not intend to be obligated until the letter was completed.[7] Fourth,

---

6. In addition, the fact that Defendant's May 22 counteroffer specifies a general release from *all* claims, while Plaintiff's June 1 letter and draft settlement specifies a release from "any kind of liabilities, demands, damages, and courses of action arising out of *this* claim," (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 6) (emphasis added), raises the possibility that the June 1 letter and draft constituted a counteroffer, rather than an acceptance. *See* 1 Arthur Linton Corbin, *Corbin On Contracts* § 86 (1963) ("A variation in the substance of the offered terms is material, even though the variation is slight.").

7. Plaintiff also argues that her requirement, contained in Guay's June 1 letter, that Defendant provide her with a letter of reference

meeting her approval rendered the June 1 letter a conditional acceptance which operated as a counteroffer and, ultimately, a rejection of Defendant's May 22 counteroffer. Thus, according to Plaintiff, no contract was ever formed. The Court is not persuaded, however, that the provision of an acceptable letter was a condition of Plaintiff's acceptance. A conditional acceptance is "an expression that purports to be an acceptance, but is so expressed as to be operative as an acceptance *only on condition that is not so specified in the offer.*" Corbin, *supra*, § 82 (emphasis added). In this case, the proposed letter was listed as a term of both Plaintiff's May 21 offer and Defendant's May 22 counteroffer.

In the alternative, Plaintiff contends that receiving an acceptable letter of reference

the parties' correspondence refers to a written settlement agreement. *See Mississippi & Dominion Steamship Co.*, 29 A. at 1067 ("If a written draft is proposed, suggested, or referred to during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."). In fact, Defendant's draft settlement explicitly states that "[Plaintiff] and [Defendant] agree that *upon execution of this Agreement,* any and all claims which were brought or alleged against [Defendant] ... will be dismissed with prejudice ...." (Pl.'s Stmt. Uncontrov. Mat. Facts Supp. Pl.'s Mot. Summ. J. Ex. 8 ¶ 5) (emphasis added).

█ Based on the existence of a genuine issue of fact as to the parties' intent to be bound to settle, the Court denies their Cross Motions for Summary Judgment as to Counts I–III of Defendant's Counterclaim. However, the Court grants Plaintiff's Cross Motion for Summary Judgment as to Count IV of Defendant's Counterclaim alleging promissory and equitable estoppel. Promissory estoppel involves " '[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance.' " *Hodgkins v. New England Telephone Co.*, 82 F.3d 1226, 1232 (1st Cir.1996) (quoting *Martin v. Scott Paper Co.*, 511 A.2d 1048, 1050 (Me.1986)). In contrast, equitable estoppel concerns "misrepresentations, including misleading statements, conduct, or silence, that induce detrimental reliance." *Cottle Enterprises,*

*Inc. v. Town of Farmington,* 693 A.2d 330, 336 n. 6 (Me.1997). Whether in reliance on a promise or induced by a misrepresentation, both doctrines require that "the party seeking to enforce the estoppel ... do what ... he would not otherwise have done." *Hart v. County of Sagadahoc,* 609 A.2d 282, 285 (Me.1992) (internal quotation omitted); *see Ashmore v. Northeast Petroleum Div. of Cargill, Inc.,* 843 F.Supp. 759, 774 (D.Me.1994). Thus, regardless of whether Plaintiff made any promises or misrepresentations in connection with the settlement discussions, she is entitled to summary judgment since Defendant has presented no evidence that it took any action it otherwise would not have taken in reliance on such promises or misrepresentations. The cost of defending itself in the present suit was not incurred by Defendant in reliance on any promise or representation made by Plaintiff with regard to settlement. *Cf. Chapman v. Bomann,* 381 A.2d 1123, 1127–28 (Me.1978) (finding genuine issue of fact as to promissory estoppel based on evidence that plaintiffs undertook "substantial financial commitment to refinance their home" in reliance on defendant's promise to sign purchase-sale contract).

### B.  USERRA Claim

Plaintiff alleges that Defendant fired her from her position as an optical lab technician in violation of USERRA. The statute provides in relevant part:

from Defendant was a condition precedent to her performance and that because Defendant did not furnish her with such a letter, her failure to perform by releasing Defendant from all liability did not constitute breach. A condition precedent is defined as "those facts and events, occurring subsequently to the making of a valid contract, that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available." 3A Corbin, *supra,* § 628. Though a party's obligation to perform may be conditioned on her personal satisfaction,

she is expected to act in good faith. *See id.* § 644; Restatement (Second) of Contracts § 228 (1981). Here, even assuming that there is a valid contract and completion of the letter was a condition precedent, the Court observes that there is a genuine issue of fact as to Plaintiff's good faith based on evidence that the condition was not fulfilled due to her failure to request further revisions of the letter. *See Fisher v. Merchants' Ins. Co.,* 95 Me. 486, 50 A. 282, 284 (1901) (finding improper trial court's refusal to instruct jury that where failure of condition precedent not defendant's fault, defendant not subject to contract).

A person who is a member of ... or has an obligation to perform service in a uniformed service shall not be denied initial employment, reemployment, retention in employment, promotion, or any benefit of employment by an employer on the basis of that membership, application for membership, performance of service, application for service, or obligation.

38 U.S.C. § 4311(a) (1994). An employer may be liable under this subsection "if the person's membership ... or obligation for service in the uniformed service is a motivating factor in the employer's action, unless the employer can prove that the action would have been taken in the absence of such membership ... or obligation for service." *Id.* at § 4311(c)(1) (1996).

The congressional record and courts which have interpreted USERRA indicate that the burden-shifting framework of the National Labor Relations Act as set forth in *NLRB v. Transp. Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) is applicable to USERRA claims. *See Gummo v. Village of Depew,* 75 F.3d 98, 106 (2d Cir.1996) (citing S.Rep. No. 158, 103d Cong., 2d Sess. 45 (1994) and H.R.Rep. No. 65, 103d Cong., 2d Sess. 18, 24 (1994), U.S.Code Cong. & Admin. News 1974, 2449); *Chance v. Dallas County Hosp. Dist.,* No. 3–96–CV–2842–BD, 1998 WL 177963, at *3 (N.D.Tex. Apr.6, 1998); *Smith v. Thomas Lighting,* No. Civ.A.1:97CV239–D–D, 1998 WL 527307, at *2 (N.D.Miss. Aug.5, 1998); *Daggett v. Chicago Transit Auth.,* No. 96 CV 05348, 1998 WL 831848, at *10 (N.D.Ill. Nov.25, 1998); *Robinson v. Morris Moore Chevrolet–Buick, Inc.,* 974 F.Supp. 571, 575 (E.D.Tex.1997). Under that framework, a claimant "is first re-

quired to establish a prima facie case of discrimination by showing by a preponderance of the evidence that his protected status was a motivating factor in the adverse employment action." *Robinson,* 974 F.Supp. at 575. To establish a certain factor as a "motivating factor," a claimant need not show that it was the sole cause of the adverse employment action, but must demonstrate that it is one of the factors that a truthful employer would list if asked for the reasons for its decision. *See id.* "If this is established, the defendant may, nonetheless, escape liability by showing by a preponderance of the evidence, as an affirmative defense, that it would have made the same decision without regard to the employee's protected status." *Id.*

In its Motion for Summary Judgment on Plaintiff's Complaint, Defendant contends that Plaintiff has failed to establish a genuine issue of fact as to her prima facie case. Defendant further argues, in essence, that there is no genuine issue as to its affirmative defense that it would have fired Plaintiff regardless of her military affiliation and related obligations.[8]

█ As a preliminary matter, the Court notes that there is no question that Plaintiff was a member of the Army Reserves, that she was obligated to attend two weeks of military training in April, and that she was terminated from Defendant's employ on March 10, the same day she informed Dunlap that she had joined the Reserves. Beyond these facts, nearly every other material fact and inference concerning Defendant's motivation is in dispute. For example, with regard to Plaintiff's prima facie case, Defendant argues that one cannot infer from the timing of the firing that

---

**8.** Citing *Novak v. Mackintosh,* 919 F.Supp. 870, 878 (D.S.D.1996), Defendant asserts that Plaintiff's USERRA claim should be analyzed under the burden-shifting framework established by the Supreme Court in *McDonnell–Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Thus, Defendant's brief discusses its burden to articulate a legitimate, "non-discriminatory rea-

son" for the firing and Plaintiff's burden to show that this reason is "pretextual." Though the Court chooses to follow the majority of courts which have applied the burden-shifting formulation found in *NLRB v. Transp. Management Corp.,* 462 U.S. 393, 401, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) to USERRA claims, it notes that both schemes lead to the same result in this case.

Plaintiff's military affiliation was a factor in her termination because Edmondson did not know that Plaintiff had joined the Reserves when he fired her. Plaintiff counters with testimony from the depositions of Edmondson and Dunlap establishing that the two had met on March 10 after Plaintiff informed Dunlap that she had joined the Reserves and before the firing. Likewise, Plaintiff challenges Defendant's assertion that it would have fired Plaintiff regardless of her military affiliation because of tardiness, absences, and poor lab skills. She points to evidence that there were no problems with her attendance or lab skills, as well as evidence that neither the January 23 vote to terminate her nor the February 26 meeting at which her poor performance was discussed ever occurred.

The Court is persuaded that Plaintiff's USERRA claim warrants submission to a jury because there is a genuine issue of fact as to whether her military status was a motivating factor in her termination and as to whether Defendant would have fired her regardless of her military status. Thus, Defendant's Motion for Summary Judgment on Plaintiff's Complaint is denied.

### IV. CONCLUSION

For the reasons discussed above, Defendant's Motion for Summary Judgment on Plaintiff's Complaint is DENIED. Plaintiff's Cross Motion for Summary Judgment on Defendant's Counterclaim is GRANTED as to Count IV. The parties' Cross Motions for Summary Judgment on Defendant's Counterclaim are DENIED as to all other counts.

*SO ORDERED.*