Richard C. MAROTTE, Sr. and Olympla Marotte, Plaintiffs,

v.

AMERICAN AIRLINES, INC. and Madeline Barrett, Defendants.

No. 00–3425–CIV–JORDAN.

United States District Court, S.D. Florida, Miami Division.

Aug. 29, 2001.

Richard J. Reisch, Carle Place, NY, Donna M. Balman, Donna M. Balman, P.A., Ft. Lauderdale, FL, for plaintiffs.

Emmet J. Schwartzman, Nancy H. Henry, Carlton Fields, P.A., Miami, FL, for defendants.

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

JORDAN, District Judge.

Richard C. Marotte, Sr. and Olympia Marotte allege that Madeline Barrett, an American Airlines employee, punched or pushed Mr. Marotte while they were trying to enter a jetway at Miami International Airport for a flight to New York, and that Mr. Marotte had to be hospitalized as a result of the assault. The Marottes sue American Airlines, Inc. for negligent hiring (Count IV), negligent supervision (Count V), negligent retention (Count VI), assault and battery (Count VII), intentional infliction of emotional distress (Count VIII), defamation (Count IX), breach of contract (Count X), and loss of consortium (Count XI). They also sue Ms. Barrett for assault and battery (Count I), intentional infliction of emotional distress (Count II), defamation (Count III) and loss of consortium (Count XI). Federal jurisdiction exists pursuant to 28 U.S.C. § 1332.

American moves for summary judgment on all of the Marottes' claims arguing that the claims are governed by the Warsaw Convention, 49 Stat. 3000, T.S. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105, and barred due to its two-year statute of limitations. For the following reasons, the motion for summary judgment [D.E. 2] is GRANTED.

## I. THE SUMMARY JUDGMENT STANDARD

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one that might affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Where the non-moving party fails to prove an essential element of its case for which it has the burden of proof at trial, summary judgment is warranted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hilburn v. Murata Electronics North Am., Inc.,* 181 F.3d 1220, 1225 (11th Cir.1999). Thus, the task is to determine whether, considering the evidence in the light most favorable to the Marottes, the non-moving parties, there is evidence on which a jury could reasonably return a verdict in their favor. *See Liberty Lobby,* 477 U.S. at 251, 106 S.Ct. 2505; *Hilburn,* 181 F.3d at 1225; *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 646 (11th Cir. 1997).

## I. THE WARSAW CONVENTION

Article 17 of the Warsaw Convention holds airlines strictly liable for personal injuries resulting from "accidents" on certain international flights. Specifically, an injured party can recover damages from a carrier—subject to certain monetary limits—if the accident causing the injuries took place on board the aircraft or occurred "in the course of any of the operations of embarking or disembarking." As some federal courts have concluded, "intentional misconduct can be an accident under Article 17" of the Convention. *See, e.g., Carey v. United Airlines,* 255 F.3d 1044, 1048–49 (9th Cir.2001).

The Supreme Court has held that recovery for personal injuries suffered on board an aircraft or in the course of any of the operations of embarking or disembarking, if not allowed under Article 17 of the Convention, are not allowed at all. *See El Al*

*Israel Airlines Ltd. v. Tsui Yuan Tseng,* 525 U.S. 155, 161, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In other words, the Convention provides the exclusive remedy for injuries within its scope, and an injured party cannot resort to state law remedies where Article 17 bars relief or does not provide any relief.

American contends that the claims by the Marottes are governed by Article 17 because Mr. Marotte's alleged injuries took place as the Marotte party was embarking—i.e., trying to get on the aircraft. Because Article 29 of the Convention contains a two-year statute of limitations, American argues that the claims in this case are time-barred. The Marottes dispute the applicability of the Convention, and maintain that they were in fact prevented from boarding their flight.

■ "Construction of the Warsaw Convention is a question of law." *Blake v. American Airlines, Inc.,* 245 F.3d 1213, 1215 (11th Cir.2001). Although the Marottes do not dispute that their flight was an international flight under the Convention, they take issue with American's argument that they were embarking when Mr. Marotte was injured. "Whether a passenger is embarking or disembarking is a question of federal law to be decided on the facts of each case," *Schmidkunz v. Scandinavian Airlines System,* 628 F.2d 1205, 1207 (9th Cir.1980), and it is to those facts that I turn.

### III. The Relevant Undisputed Facts

The complaint and affidavits filed by the parties establish the following undisputed material facts for summary judgment purposes.

On August 20, 1996 Mr. Marotte, Mrs. Marotte, their son Richard Marotte Jr., and his girlfriend attempted to get on their intended flight from Miami to New York. *See* Affidavit of Richard Marotte ¶ 3 [D.E. 11, Exh. A] (Dec. 11, 2000). This flight was the final leg of their round-trip travel from New York, New York, to the Bahamas. *See* Affidavit of Margaret Martin ¶ 3 [D.E. 2, Exh. A] (Sep. 21, 2000). Mrs. Marotte was unable to find the tickets and boarding passes, so Mr. Marotte asked the desk attendant at the gate if they could board the plane anyway because the computer records showed that the tickets had been paid for and that seat assignments had been given. Mr. Marotte explained that he wanted to board the plane as soon as possible because he recently had heart bypass surgery, was a diabetic, and was not feeling well. *See* Affidavit of Richard Marotte ¶ 5. The gate attendant called her supervisor, Ms. Barrett, who informed Mr. Marotte that he would have to buy new tickets because the tickets previously purchased were like cash. *See id.* ¶ 6. Despite Mr. Marotte's repeated requests to board the plane due to his condition, Ms. Barrett refused to permit the party to board without buying new tickets. *See id.* ¶ 7.

While Mr. Marotte called American Express, through whom he had initially purchased the tickets, Mrs. Marotte found all the tickets and boarding passes in her pocketbook. Mrs. Barrett began to berate her saying that if she had not been so lazy in searching for, and negligent in not finding the tickets to begin with, she (Ms. Barrett) would not have had to go through so much trouble. *See id.* ¶ 9. Mr. Marotte complained about Ms. Barrett's behavior, and Mrs. Marotte took down Ms. Barrett's name to report her conduct. *See id.* ¶ 10.

Still in possession of their tickets and boarding passes, the Marotte group started walking toward the glass door that

leads to the gate. *See id.* Before they could pass through, the glass door was suddenly closed at Ms. Barrett's direction. Ms. Barrett began yelling, got off the chair behind the counter where she had been sitting, and approached Mr. Marotte. Ms. Barrett punched or pushed Mr. Marotte in the chest so hard that he was propelled against the door and fell to the ground. Ms. Barrett then kneeled on top of Mr. Marotte, grabbed all of their tickets and passes, tore them up, called security, told them to call the police, and directed other personnel not to let the Marotte group board the plane. *See id.* ¶ 11; Affidavit of Olympia Marotte ¶ 4 [D.E. 11, Exh. B] (Dec. 5, 2000); Affidavit of Richard Marotte, Jr. ¶ 3 [D.E. 11, Exh. C] (Dec. 5, 2000).

Mr. Marotte was eventually taken by ambulance to a hospital, where he remained for a number of days. Mrs. Marotte stayed in Miami with him until he was released from the hospital. *See* Affidavit of Richard Marotte ¶ 13. Richard Marotte, Jr., and his girlfriend returned to New York the next day.

### IV. ANALYSIS

American's position is that its liability is governed by the Warsaw Convention and that the Marottes are barred from any recovery because they failed to file suit within the Convention's two-year statute of limitations. The Marottes, on the other hand, contend that the Convention does not apply and maintain that they seek damages under state tort law. The sole issue for my determination is whether Mr. Marotte was "in the course of embarking" the aircraft within the meaning of the Convention at the time of Ms. Barrett's assault. If he was, then the Marottes' claims are time-barred.

Article 17 of the Convention provides as follows:

the carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

49 U.S.C.App. § 1502. The terms "embarking" and "disembarking" are not defined by the Convention. Thus, in determining whether a passenger was "in the course of any of the operations of embarking" courts consider the following factors: (1) the passenger's activity at the time of the accident; (2) the passenger's whereabouts at the time of the accident; and (3) the amount of control exercised by the carrier at the moment of the injury. *See, e.g., McCarthy v. Northwest Airlines,* 56 F.3d 313, 317 (1st Cir.1995); *Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 617 (7th Cir.1989); *Evangelinos v. Trans World Airlines, Inc.,* 550 F.2d 152, 155 (3d Cir.1977) (*en banc* ); *Maugnie v. Compagnie Nationale Air France,* 549 F.2d 1256, 1261–62 (9th Cir.1977); *Day v. Trans World Airlines, Inc.,* 528 F.2d 31, 33 (2d Cir.1975). No single inquiry is dispositive, and the three factors form a "single unitary [analytical] base." *McCarthy,* 56 F.3d at 317. Because the "terms 'embarking' and 'disembarking' . . . connote a close temporal and spatial relationship with the flight itself," there "must be tight tie between an accident and the physical act of entering an aircraft." *Id.* at 316, 317.

The undisputed facts are that Ms. Barrett ordered the glass door leading to the gate to be closed when the members of the Marotte party—boarding passes in

hand—were about to enter so that they could board the flight. Ms. Barrett then assaulted Mr. Marotte, knocked him down, took the Marotte party's passes and tickets from Mr. Marotte, and instructed security not to let the party board the flight. These facts, it seems to me, bring the Marottes' claims within the ambit of the Convention, as they demonstrate that the Marottes were in the process of embarking at the time of the incident. First, Mr. Marotte and his party had their boarding passes in hand and were about to board the airplane. Second, Mr. Marotte and his party were at the glass door leading to the gate and were about to enter the door when it was closed at Ms. Barrett's direction. They were no longer in the common passenger area of the airport. Third, American was exerting control over the Marotte party at the time of the incident. The glass door was the only means of reaching the plane, so the Marotte party was required to use it to board their flight. No one on American's behalf gave the Marotte party permission ·to go through the glass door and to the airplane, and in fact Ms. Barrett—who had earlier prohibited the party from boarding without their tickets—physically prevented the party from boarding the flight by ordering the glass door to be closed, assaulting Mr. Marotte, and taking the tickets and passes from Mr. Marotte. *See Rajcooar v. Air India Ltd.,* 89 F.Supp.2d 324, 327–28 (E.D.N.Y.2000) (passenger in process of embarking when he suffered heart attack even though not acting under specific control of airline—passenger was proceeding to departure gate, had completed virtually all steps required to board, and was in part of airport accessible only to passengers on international flights).

The fact that the Marotte party had not actually reached the airplane at the time of Ms. Barrett's assault does not change this result. In *Evangelinos,* the Third Circuit correctly rejected a hard and fast rule based strictly on location:

> [W]e cannot concede to the notion that a line can be drawn at a particular point, such as the exit door of an air terminal which leads to the airfield. This is because a test that relies on location alone is both too arbitrary and too specific to have broad application, since almost every situation and every airport is different.

550 F.2d at 155. *See also Maugnie,* 549 F.2d at 1261 (holding that a "rule based solely on location of passengers is not in keeping with modern air transportation technology" and that "determining whether passengers were inside or outside the airport terminal at the time of injury should not end the analysis").

Mr. Marotte contends that his case is analogous to *Rullman v. Pan American World Airways, Inc.,* 122 Misc.2d 445, 471 N.Y.S.2d 478 (N.Y.Sup.1983), and thus does not fall within the Warsaw Convention, but that decision is distinguishable. In *Rullman,* the plaintiff was scheduled to fly from Rome, Italy, to New York, New York, with a one-hour stopover in Ireland. She presented her ticket at the check-in counter at the airport in Rome, was checked in, and checked her baggage. She became ill in the airport terminal waiting room during an eight-hour delay, and argued that she became ill because of the inadequate terminal facilities. After the first leg of her flight, the plaintiff disembarked for her layover and sat in the terminal by a window. During her wait she tried to get medical treatment at an infirmary. After an additional three-hour delay the passengers were informed that their plane would not continue its flight to

New York until the following morning. The passengers were instructed to retrieve their personal belongings from the airplane, after which they would be taken to a hotel for the night. While reboarding the plane to collect her belongings, the plaintiff fainted and fell approximately ten feet from the door of the aircraft, on the jetway connecting the terminal and the plane. *See id.* at 479. The plaintiff, who suffered injury to her knee as a result of the fall, alleged that the airline breached its duties to her by failing to provide her with food, drink, or adequate rest or medical facilities during her eight-hour and three-hour delays.

The *Rullman* court first held that the plaintiff's injury was not an "accident" within the meaning of the Warsaw Convention. The court also held that the airline's breach of its duty to the plaintiff did not occur during operations of embarking or disembarking. *See id.* at 481. The court found that "the gravamen of the complaint [was] that Pan Am's negligent operation of the terminal waiting rooms at Ciompino and Shannon Airports caused the plaintiff to faint and fall on the jetway." *Id.* at 479. The court, however, specifically distinguished this situation from one in which the plaintiff had fallen in the terminal. The court explained that "had plaintiff simply tripped on a carpet in the jetway and injured herself and that constituted the gravamen of the complaint, [Pan Am's] claim that she was injured while embarking might be meritorious." *Id.* at 481.

During the delays in question, the plaintiff in *Rullman* was not at any of the gates leading to the respective jetway, but rather was waiting in the appropriate terminal waiting room. She was free to move about those terminals and was not under the direction of the airline personnel. Her purpose at each of the times the airline supposedly breached its duties toward her was to wait for her flight, and not to board any plane.

It goes without saying that waiting for a plane and trying to board one are two different things, and that difference is important under Article 17 of the Warsaw Convention. In contrast to the plaintiff in *Rullman*, the Marottes were not lounging in a terminal waiting room at the time of Ms. Barrett's alleged assault. They were instead preparing to board the plane imminently to continue with their flight. They only had to present their boarding passes or tickets and walk through the glass door to the gate, which led to the jetway.

■ The Marottes' argument that the Convention is inapplicable because Ms. Barrett actually prevented their party from getting on the flight is not persuasive. The applicability of the Convention is not dependent on the success of embarkation, but rather on whether the accident in question took place during the process of embarking. *See Evangelinos*, 550 F.2d at 155–56; *Day*, 528 F.2d at 33–35. *Cf. Schmidkunz v. Scandinavian Airlines System*, 628 F.2d 1205, 1206–07 (9th Cir. 1980) (passenger injured on moving walkway not embarking within meaning of Convention because she was in common passenger area of airport and about 500 yards from boarding gate, had not received boarding pass from airline, was not under direction of airline's personnel, and was not imminently preparing to board flight).

*Thach v. China Airlines Ltd.*, No. 95 Civ. 8468(JSR), 1997 WL 282254 (S.D.N.Y. May 27, 1997), presents an analogous set of facts. The plaintiff in *Thach* was flying home to New York from Vietnam. He was

traveling home earlier than scheduled because his fiancé was experiencing difficulties with her pregnancy. At an intermediate stop in Taiwan, all passengers bound for New York were required to change planes. Before boarding the new plane, China Airlines officials reinspected each passenger's travel documents. *See id.* at *1. The plaintiff held a valid, newly issued U.S. passport, but the employee at the CAL transit counter became suspicious because of its new appearance and because the plaintiff looked Vietnamese. The employee took the passport to the Taiwan Aviation Police Bureau where a police official inspected it. The police official was also suspicious of the passport, but was unable to confirm his suspicions and thus returned the passport to the plaintiff. A short while later, the police official went to the CAL transit counter with a U.S. passport belonging to another passenger and told the CAL employee that he believed the plaintiff's passport was fake because the three red stars on the side had a different tint than the stars on the passport he was examining. The police official and the CAL employee went to the boarding gate where they located the plaintiff, who was waiting to board his flight, and reinspected his passport. Based on a comparison of the two passports, the police official mistakenly concluded that the plaintiff's passport was fraudulent and so advised the CAL employee. The CAL employee advised the plaintiff that he would not be permitted to travel on CAL to New York. The plaintiff was detained at the airport by the police for about ten to twelve hours, and was ultimately forced to board the next available flight to Vietnam. *See id.* at *1–*2. Only after considerable further delay was the plaintiff able to return from Vietnam to his home in New York. The district court held, with little analysis, that it was "clear that the accident occurred during the operations of embarking or disembarking." *See id.* at *3.

## V. CONCLUSION

Based on the undisputed facts, I conclude that the Marottes' claims are within the scope of the Warsaw Convention. The Marottes' imminent boarding and their proximity to the gate and the airplane, together with the control exerted by American's employee, Ms. Barrett, demonstrate that the Marotte party was "in the course of any of the operations of embarking" at the time of the alleged incident. Because the Marottes' claims are time-barred by the Convention's two-year statute of limitations, American's motion for summary judgment [D.E. 9] is GRANTED. I decline to exercise supplemental jurisdiction over the Marottes' claims against Ms. Barrett, who apparently still has not been served. *See* 28 U.S.C. § 1367(c)(3).

A final judgment will issue by separate order.