# United States Court of Appeals
## For the First Circuit

———————————

No. 01-1456

MARIE E. TOMAIOLO, ET AL.,

Plaintiffs, Appellants,

v.

MICHAEL D. MALLINOFF, ET AL.,

Defendants, Appellees.

———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. Ronald R. Lagueux, U.S. District Judge]

———————————

Before

Torruella, Lynch, and Lipez, Circuit Judges.

———————————

Thomas W. Kelly for appellants.

Marc DeSisto with whom Kathleen M. Powers was on brief for appellees Michael D. Mallinoff, Joel Johnson, David B. Okun, John Day, Audrey Cornell, George Cross, Pamela J. Fontaine, Jane A. Steere, Frances Shocket, Claudette A. Paine, William A. Hanlon, David L. Krugman, Henrietta T. Delaga, Carolyn A. Joaquin, Doris M. Yeaw, Janette H. Hopkins, Dorothy E. Caldwell, Kenneth L. Richardson Jr., Robert E. Gordon, Diane Larisa, Dennis Finlay, Maryann Packer, Nancy Mello, Kathleen A. Raposa, Carol A. Touzin, John Mainville, Bruce Young, and the towns and cities of Barrington, Bristol, Central Falls, Coventry, Cumberland, Exeter, Foster, Glocester, Jamestown, Lincoln, Middletown, Narragansett, North Smithfield, West Warwick, Scituate, Charlestown, Johnston, Pawtucket, Portsmouth, Smithfield, South

Kingstown, Tiverton, Warren, Woonsocket, and Burrillville, Rhode Island.

Mark W. Freel with whom Annemarie M. Carney and Edwards & Angell, LLP were on brief for appellees Transamerica Corporation, James Houghton, Mark Williams, and Beni Osuna.

_____

February 19, 2002
_____

LYNCH, **Circuit Judge**.    Twenty-three owners of real property in Rhode Island were disadvantaged by being part of a group required to pay their real estate taxes annually rather than quarterly. These property owners, whose mortgage companies held their tax payments in escrow, were required to pay taxes in one lump sum; other property owners, who paid their taxes directly to the municipalities, could choose to pay quarterly. The quarterly payment method is more favorable to the taxpayer because it permits the taxpayer to receive the interest on the escrowed funds until the quarter in which payment is due.

The desires of aggrieved local taxpayers to assert their claims against municipal tax collectors in federal court are pitted against the comity interests urging restraint in the exercise of federal court jurisdiction over state tax matters. The comity interests prevail: the plaintiffs are left to the recourse available to them in state court.  We reject as well the claim that certain private actors are state actors and affirm the dismissal of pendent state claims.

I.

The escrow accounts relevant to this case were held by federally regulated banks, mortgage companies, and escrow

-3-

agents. Under the authority of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. §§ 2601–2617 (2000), the federal Department of Housing and Urban Development (HUD), has promulgated a regulation, known as Regulation X, which reads in relevant part:

> For the payment of property taxes from the escrow account, if a taxing jurisdiction offers a servicer a choice between annual and installment disbursements, the servicer must also comply with this paragraph (k)(3). If the taxing jurisdiction neither offers a discount for disbursements on a lump sum annual basis nor imposes any additional charge or fee for installment disbursements, the servicer <u>must</u> make disbursements on an installment basis.

63 Fed. Reg. 3214, 3237 (Jan. 21, 1998) (emphasis added) (codified at 24 C.F.R. § 3500.17(k)(3) (2001)).[1] This requirement benefits the borrower because quarterly payment

---

[1] We note that HUD issued the rule containing the language we quote in January 1998, after some but not all of the events relevant to this litigation had already occurred. HUD states in its contemporaneous summary of the 1998 rule that this language merely clarifies its earlier rule, issued in October 1994. <u>See</u> 63 Fed. Reg. 3214, 3214 ("[T]his rule maintains the current requirements under Regulation X, but clarifies them."); <u>see</u> <u>also</u> 59 Fed. Reg. 53,890, 53,893 (Oct. 26, 1994) ("Unless there is a discount to the borrower for early payments, the regulation does not allow servicers to pay installment payments on an annual or other prepayment basis."). Exactly what rule was in force at what time could be important to a resolution of this case on the merits. Our view of the case, however, requires no further discussion of the matter.

-4-

generally makes more sense for borrowers than does an up-front lump sum annual payment. The following paragraph of the regulation permits the borrower and loan servicer to agree otherwise, provided the agreement is voluntary and uncoerced. 24 C.F.R. § 3500.17(k)(4). RESPA regulates the mortgage and escrow companies; it does not regulate municipalities.

After the passage of Regulation X, many lenders in Rhode Island continued to make annual, rather than quarterly, payments of property taxes from escrow accounts. The difference in treatment between payments from escrow accounts and direct payments from taxpayers had arisen because the taxing municipalities took the position that taxpayers who paid through escrow accounts were not "persons assessed" entitled to make payment on a quarterly basis under the relevant statute, R.I. Gen. Laws § 44-5-7.[2] On this interpretation of Rhode Island law,

_____

[2]    At the time, that section provided in its entirety:

Every city and town shall make provision for the payment in installments of any tax levied under the provisions of § 44-5-1 by adding to and making a part of the resolution ordering the assessment and the collection of the tax an option permitting <u>persons assessed</u> to pay their taxes in equal quarterly installments if they so desire, the amounts and dates for payment of the installments to be specified in the

-5-

the municipalities were not "taxing jurisdiction[s which] offer[ed] . . . a choice," 24 C.F.R. § 3500.17(k)(3), between annual and quarterly payment, so that Regulation X did not apply. Understandably unhappy with the "overescrowing" of their accounts, the taxpayers took their problem to the Attorney General of Rhode Island, who agreed with them that Rhode Island law, properly read, did not permit a distinction between the two groups of taxpayers. In 1998 the Attorney General so advised the various municipalities and threatened to sue them if they did not mend their ways.

Thereafter, in 1999, the Rhode Island General Assembly amended the statute. Under that amendment, "persons assessed" now expressly includes mortgage companies and escrow agents. The legislature also provided, however, that local tax collectors who had read the statute otherwise in the past would be considered to have followed the law. See 1999 R.I. Pub. Laws

---

resolution; provided, however, that the city or town may provide that the option contained in the resolution shall not apply to any tax levied in an amount not in excess of one hundred dollars ($100) in which case the tax shall be payable in a single installment.

R.I. Gen. Laws § 44-5-7 (1995) (emphasis added) (amended 1999).

-6-

ch. 493 (codified at R.I. Gen. Laws § 44-5-7 (1999)). The local governments of Rhode Island appear now to comply with the law.

Although the practice of overescrowing had ended, the plaintiff group of taxpayers still faced the problem of the loss of the use of their money due to overescrowing from 1995 to 1998. The municipalities, and not the taxpayers, had received the interest on the sums paid prematurely. The taxpayers felt they were entitled to be made whole.

## II.

Marie E. Tomaiolo and a group of other named plaintiffs (for simplicity, we will refer from now on to Tomaiolo alone) sued the tax collectors and almost all of Rhode Island's municipalities (the "municipal defendants"), Transamerica Corporation, and individuals employed by Transamerica Real Estate Tax Service (TRETS). TRETS is the nation's largest tax servicing firm and a division of Transamerica. Tomaiolo alleged that Transamerica and the individual employees (the "escrow defendants") were state actors and that all the defendants collectively:

1. deprived affected taxpayers of their property (the tax payments, or at least the interest on them) without due process of law (because the process due was that provided

by RESPA, Regulation X, and § 44-5-7) in violation of the Fourteenth Amendment's Due Process Clause;

2. interfered with the taxpayers' rights to fair and equal taxation under that Amendment's Equal Protection Clause;

3. violated the taxpayers' rights under Article 1, Section 2 of the Rhode Island Constitution, requiring equal distribution of the burdens of government and guaranteeing due process and equal protection of the laws;

4. intentionally interfered with the taxpayers' contractual relationships with their banks.

Tomaiolo alleged other claims, but has since abandoned them.

The parties filed cross-motions for summary judgment.

In a thoughtful opinion, Tomaiolo v. Transamerica Corp., 131 F. Supp. 2d 280 (D.R.I. 2001), the district court:

1. dismissed without prejudice all federal claims against the municipal defendants as barred by both the Tax Injunction Act and the principles of comity articulated in Fair Assessment In Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100 (1981);

2. dismissed all federal claims against the escrow defendants because they were not state actors;

3. exercised supplemental jurisdiction over the state law claims against the escrow defendants and granted summary judgment for those defendants.

The district court never reached the question whether to certify this case as a class action. This appeal followed.

III.

-8-

We review the district court's rulings de novo. See McCarthy v. N.W. Airlines, 56 F.3d 313, 314-15 (1st Cir. 1995) (reviewing de novo a grant of summary judgment); Murphy v. United States, 45 F.3d 520, 522 (1st Cir. 1995) (same for a dismissal for lack of subject matter jurisdiction); Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B., 958 F.2d 15, 17 (1st Cir. 1992) (same for a dismissal for failure to state a claim).

We address the questions presented by this appeal in the following order. First, we hold that Tomaiolo's claims for injunctive and declaratory relief are moot. Second, we hold that she may not recover money damages against the municipal defendants under the authority of Fair Assessment. Third, we hold that the district court correctly granted summary judgment on her claim under § 1983 against the escrow defendants because those defendants were not acting under color of state law, as that statute requires. Fourth, we hold that the district court did not abuse its discretion in exercising supplemental jurisdiction over some, but not all, of the state law claims, and that it dealt correctly with those it addressed.

A.  Mootness of Claims for Injunctive and Declaratory Relief

Tomaiolo's claims for injunctive and declaratory relief are moot and indeed were moot before the district court dismissed them. The conduct by the municipal defendants of which Tomaiolo complains -- that is, their demand in alleged violation of federal and state law that she and her class pay their property taxes annually rather than quarterly -- has ceased. There is, of course, the familiar principle that a request for injunctive or declaratory relief does not become moot simply because a defendant voluntarily ceases the allegedly unlawful conduct. E.g., Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 189-93 (2000). The actions of the municipal defendants, however, were not voluntary but rather compelled by superior state officials: the Attorney General in 1998, and the state legislature in 1999. Tomaiolo's claims for injunctive and declaratory relief concern conduct with no possibility of recurring, and are moot. See United States v. W.T. Grant Co., 345 U.S. 629, 633 (1953). Counsel for Tomaiolo conceded this point at oral argument. Tomaiolo's claims for damages remain. We will address these claims separately as to the municipal and the escrow defendants.

B. Dismissal of Federal Claims Against Municipal Defendants

The district court dismissed without prejudice the claims against the municipal defendants on the basis that the claims were barred by the Tax Injunction Act and by principles of comity.

## 1.  The Tax Injunction Act, comity, and § 1983

Our analysis of the district court's decision to dismiss this claim is governed by the standard laid down by the Supreme Court in the case of Fair Assessment in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100 (1981).  Under that standard, Tomaiolo cannot obtain damages for the administration of a state tax system under § 1983, even though that administration may have violated federal law, so long as state law provides her a plain, complete, and adequate remedy.  Id. at 116.  Before we apply Fair Assessment's standard, however, a brief discussion of the case and subsequent developments may clarify the relevant law.

The Tax Injunction Act of 1937 provides in its entirety:

> The district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State.

28 U.S.C. § 1341 (1994). The Act limits the jurisdiction of the federal courts, rather than merely restricting the remedies available in a given civil action. Trailer Marine Trans. Corp. v. Rivera Vazquez, 977 F.2d 1, 4-5 (1st Cir. 1992).

By its terms the Act applies to actions in which plaintiffs seek injunctions against state officers. The Supreme Court did not address the question whether the Act applies to actions in which plaintiffs seek damages until 1981. That year, in Fair Assessment, a group of property owners brought a suit for damages under § 1983, claiming that their county's tax assessors had denied them equal protection and deprived them of their property without due process of law by failing to reassess old properties in a timely fashion and by retaliating against those who successfully appealed property assessments. 454 U.S. at 105-06. In deciding the case, the Supreme Court stated that it would not rely on the Tax Injunction Act. Id. at 107. Instead, it held that the principle of comity between the federal and state governments -- a principle embodied in, but not limited to, the Act -- barred a federal court from

considering the damages claim.  Id. at 107, 116.[3]  The Court said as well that the principle of comity would not apply to a case in which a state provided no "plain, adequate, and complete" remedy for violations of federal law in the tax collection process.  Id. at 116.[4]

The Court has since explained that what it did in Fair Assessment was to construe § 1983, in light of the principle of comity, to provide no cause of action for damages in state tax cases.  In Lehman v. Lycoming County Children's Services Agency, 458 U.S. 502 (1982), the Court noted that in Fair Assessment it

---

[3]  A forceful concurrence by four members of the Court objected to the application of the principle of comity to an action for damages.  The concurring justices argued that federal courts properly consider comity in traditionally equitable actions, such as injunctive proceedings, but cannot properly do so in traditionally legal ones, such as damages proceedings. Fair Assessment, 454 U.S. at 117 (Brennan, J., concurring in the judgment).  Some of the concurring justices' concerns have since been resolved.  No reading of Fair Assessment as applying principles of equitable discretion to a damages action survived Quackenbush v. Allstate Insurance Co., 517 U.S. 706 (1996), which is discussed in the text.

[4]  The Court in Fair Assessment neither recognized nor wholly ruled out any difference between this requirement, drawn from its equitable jurisprudence, and the parallel requirement in the Tax Injunction Act (also drawn from equity) that to qualify for protection from federal intervention a state must provide "plain, speedy, and efficient" remedies.  454 U.S. at 116 n.8.

had "conclude[d] that 42 U.S.C. § 1983 does not confer jurisdiction on the federal courts to hear suits for tax refunds when state law provides an adequate remedy." Id. at 512 n.16. In National Private Truck Council, Inc. v. Oklahoma Tax Commission, 515 U.S. 582 (1995), the Court stated that "in Fair Assessment . . . the principle of noninterference with state taxation led us to construe § 1983 narrowly." Id. at 589. Most recently, in Quackenbush v. Allstate Insurance Co., 517 U.S. 706 (1996), the Court observed that in National Private Truck Council it had "indicated that Fair Assessment was a case about the scope of the § 1983 cause of action." Id. at 719. Accordingly, it is clear that Fair Assessment applies to this case, because Tomaiolo is bringing a § 1983 action for damages suffered in the allegedly unlawful administration of a state tax system. It is less clear -- as a matter of Supreme Court precedent -- that the Tax Injunction Act itself applies.[5]

2. Application to this case

---

[5] The law of this circuit may differ after Cumberland Farms, Inc. v. Tax Assessor, 116 F.3d 943 (1st Cir. 1997), which states, citing National Private Truck Council and without further analysis, that the Tax Injunction Act applies directly to suits under § 1983 for money damages. See id. at 945. The result in this case does not depend on such subtleties.

-14-

We proceed to apply Fair Assessment to this case. If Tomaiolo is alleging that Rhode Island officials have administered the tax system of that state in violation of the federal Constitution, she may not bring a case in federal court so long as Rhode Island provides a remedy for such violations that is plain, adequate, and complete.[6]

Tomaiolo's complaint, summarized above, demonstrates that she is indeed alleging that the administration of Rhode Island's tax system violated federal law. She responds, however, that she is not challenging the validity of applicable state law (§ 44-5-7), but is merely alleging that the municipal

---

[6] Nothing about this case requires us to ask whether this question may ever differ from the question whether the remedy is plain, speedy, and efficient, a question unanswered by the Supreme Court in Fair Assessment. As we discuss, Rhode Island's remedies appear plain, speedy, efficient, complete, and adequate. Moreover, because the two inquiries are identical for the purposes of this case, we have no occasion to consider whether the rule of Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 93-102 (1998), which requires courts to decide questions of subject matter jurisdiction before deciding those that go to the merits, would require us to base our holding on the Tax Injunction Act rather than on Fair Assessment if the two inquiries diverged. Indeed, we note that many courts applying the Tax Injunction Act and Fair Assessment have in effect rolled the two inquiries into one. See, e.g., Kerns v. Dukes, 153 F.3d 96, 101 (3d Cir. 1998) (discussing the effects of the statute and the case "taken together").

-15-

defendants, conspiring with the escrow defendants, misinterpreted that state law; that their misinterpretation put them in conflict with RESPA;[7] and that it also led to constitutional violations. A claim that a misinterpretation of state law led to violations of federal rights is still a claim that local officials broke federal law in interpreting and applying state law. Tomaiolo's argument amounts to a distinction without a difference. Moreover, if underlying her federal arguments is a fundamental assertion that defendants violated state law, all the more reason to defer to the state system to determine what state law means.

Tomaiolo does not seriously contest that Rhode Island provides a plain, adequate, and complete remedy through which taxpayers may contest their taxes and have their federal claims heard in state court. See, e.g., Oster v. Tellier, 544 A.2d 128, 132 (R.I. 1988) (holding certain provisions of the Rhode Island tax code under R.I. Gen. Laws § 44 unconstitutional but

---

[7] Because RESPA does not purport to govern municipal officials, it is unclear in any event whether their actions could possibly have violated rights protected by that statute. To the extent that Tomaiolo bolsters her claim by relying on her theory of a public-private conspiracy, we reject that theory below.

declining to award rebate for failure of proof of an ascertainable amount of damages); see also Sterling Shoe Co. v. Norberg, 411 F. Supp. 128 (D.R.I. 1976) ("[P]laintiff's constitutional attack upon the adequacy of Rhode Island's statutory scheme to contest tax assessments is wholly insubstantial . . . ."). Tomaiolo offers nothing to contradict that conclusion. In fact, she filed an identical action in the Rhode Island Superior Court, which has effectively been stayed pending the outcome of this action.

She does raise two additional arguments, which we discuss briefly. First, she argues that the outcome we reach conflicts with the historical role of the federal courts as a forum for the enforcement of federal rights, citing cases such as Wright v. Roanoke Redevelopment & Housing Authority, 479 U.S. 418 (1980), in which the Court held that § 1983 provided a cause of action for residents of federally funded public housing against the local housing authority that administered their program. In Fair Assessment itself, the Court balanced the conceded interests of § 1983 plaintiffs in a federal forum against the interests of state and local defendants in the uninterrupted operation of their tax systems. 454 U.S. at 116

-17-

(noting that the Court reached its result "despite the ready access to federal courts provided by" Monroe v. Pape, 365 U.S. 167 (1961), "and its progeny"). Tomaiolo's argument has therefore already been taken into consideration in formulating the rule we apply.

Second, she argues that this case differs from Fair Assessment because in that case the alleged official misconduct was continuing, so that a federal court's damages award would in effect have halted it. In this case, she says, the alleged misconduct has ceased, so that federal intervention would operate only to cure the past wrong and not to affect the present operation of the system. We reject this argument because the procedure by which a state taxpayer may obtain a refund of an allegedly illegally collected tax is no less a part of the smooth functioning of the state's tax system than the collection of the taxes in the first place. Perhaps, as Tomaiolo maintains, the disruption we would cause by intervening would be less on the facts of this case. Any such difference would not be so great as to justify recognizing an exception to Fair Assessment along the lines she proposes.

Thus, we agree that the federal claims against the municipal defendants were properly dismissed under Fair Assessment.

C. Dismissal of Federal Claims Against Escrow Defendants

Tomaiolo alleged that the escrow defendants acted under color of state law and thus could be reached under 42 U.S.C. § 1983. Unless the escrow defendants were state actors, either directly or by a close enough nexus to the state in defined ways, there is neither a § 1983 claim nor a claim against them for violation of constitutional rights. See Yeo v. Town of Lexington, 131 F.3d 241, 248-49 & n.3 (1st Cir. 1997) (discussing the requirement of state action for claims under the Fourteenth Amendment and § 1983). We do not reach the question whether Tomaiolo otherwise asserts a cognizable claim that her constitutional rights and those of her class were violated.

We summarize briefly the relevant facts. On a grant of summary judgment, these facts are read in the light most favorable to Tomaiolo. McCarthy, 56 F.3d at 314. HUD issued the amendments to Regulation X relevant to this action in October 1994. TRETS then or shortly thereafter realized that the amendments would change the way it handled escrow accounts

-19-

across the country.  Mark Williams, who managed TRETS operations across several New England states, directed James Houghton, who worked for TRETS in Rhode Island, to determine the position of Rhode Island's municipal tax collectors as to whether their municipalities required annual payment of property taxes, or permitted quarterly payment.  Williams and Houghton, together with Beni Osuna, a TRETS employee in Dallas who led the TRETS task force working on Regulation X, appear at that time to have believed that Rhode Island state law left this choice to each municipality.

Houghton visited many of the municipal defendants, explaining the content and effects of the amendments to Regulation X, and distributing to at least some of them a two-page summary of the amendments prepared by TRETS.  He also told them that unless they issued letters requiring annual payment of property taxes from escrow accounts, TRETS would make quarterly payments.  Shortly thereafter, over thirty of the municipal defendants sent out a total of thirty-three letters of the sort Houghton had mentioned.  Some of the letters are substantially the same; Houghton appears to have carried copies from one municipality to another.

Tomaiolo argues that the escrow defendants themselves misinterpreted Rhode Island law, communicated that misinterpretation to the municipal defendants, and then induced the sending of some thirty-three virtually identical letters from the municipal defendants back to the escrow defendants adopting that misinterpretation, thus leading to the constitutional violations. This is a form of "entwinement" state action theory, under which nominally private action becomes so mixed and intermingled with state action that it can no longer be called truly private.

The latest Supreme Court cases to address whether apparently private actors may be considered state actors on an entwinement theory are <u>Brentwood Academy</u> v. <u>Tennessee Secondary School Athletic Ass'n</u>, 531 U.S. 288 (2001), and <u>National Collegiate Athletic Ass'n</u> v. <u>Tarkanian</u>, 488 U.S. 179 (1988). <u>Brentwood</u> held that the activities of an athletic association within a single state could fairly be treated as those of the state itself, because "[t]he nominally private character of the Association [was] overborne by the pervasive entwinement of public institutions and public officials in its composition and workings, and there is no substantial reason to claim unfairness

-21-

in applying constitutional standards to it." 531 U.S. at 298. In contrast, in Tarkanian, the activities of a multistate athletic association were those of a collective membership, and the association was not the surrogate of any state. 488 U.S. at 193-94.

Here, to be sure, enforcement of state tax laws and collection of state taxes is emphatically a state function. But the classic indicia of entwinement, much less pervasive entwinement, are missing. There is no financial support from the state to the escrow defendants, much less any support that interplays with the decisions taken; nor is there any allocation of traditional state functions to the private entities. Also lacking is any evidence that the government is the real actor behind a private facade, joining in a charade designed to evade constitutional prohibitions.[8]

---

[8]    Thus, for example, in Adickes v. S. H. Kress & Co., 398 U.S. 144 (1970), on which Tomaiolo relies, the Court held in reversing summary judgment for the defendant, a private restaurant, that the plaintiff might be able to establish facts at trial showing that that the restaurant had in effect become a state actor. In that case, Adickes was refused service in the restaurant, allegedly because she was a white woman in the company of black children; she offered evidence that would allow a jury to find that a police officer (who subsequently arrested Adickes for vagrancy) had reached an understanding with the

At most there is an argument that the escrow defendants somehow caused or induced the municipal actors to take the steps they did. An "inducement" theory is a particularly weak and problematic theory of state action, often rejected. See Roche v. John Hancock Mut. Life. Ins. Co., 81 F.3d 249, 253-54 (1st Cir. 1996) (affirming a grant of summary judgment for a corporate employer whose agents reported to the police their suspicions that a laid-off employee had made harassing phone calls); Alexis v. McDonald's Rests. of Mass., Inc., 67 F.3d 341, 351-52 (1st Cir. 1995) (affirming a grant of summary judgment for a restaurant manager who called the police to remove a patron); see also Tarkanian, 488 U.S. at 192 (observing that such a claim "mirrors the traditional state-action case"). It has sometimes been accepted on particularly compelling facts. See, e.g., Wagenmann v. Adams, 829 F.2d 196, 210-11 (1st Cir. 1987) (affirming a jury verdict against a private citizen on a

_____

restaurant staff that she was not to be served. Id. at 157-58. Adickes illustrates that courts will at times hold liable a private actor who agrees to do the unconstitutional bidding of a public officer. It does not govern the far different case presented here, in which at most a public officer -- on whom rested the ultimate responsibility to uphold the law -- took the allegedly incorrect advice of a private actor.

record that enabled the jury to find that because of the citizen's influence "the . . . police felt <u>constrained</u> to jail the plaintiff notwithstanding the absence of any legal basis to do so").

The inducement theory of state action is problematic for at least two reasons. First, it assumes that state actors do not exercise their independent judgment in the face of requests from private citizens, but merely act as puppets. Second and more importantly, the theory may impose burdens on the rights of private citizens to communicate with government officials on topics of concern. <u>Cf.</u> <u>Yeo</u>, 131 F.3d at 255 ("Where, as here, there are First Amendment interests on both sides of the case, the analysis of whether there is state action must proceed with care and caution.").

Here, there is insufficient evidence that the town officials abandoned their best judgment as to the meaning of state law. Tomaiolo produced evidence that many of the letters sent by the municipal defendants contained similar or identical language, and that many of the letters were sent soon after Houghton's visits. She also argues that the municipal defendants shared an incentive to adopt the reading of state law

-24-

that they did.  From this, a jury could find that some of the municipal defendants saw letters written by the others, that Houghton had carried the letters from one defendant to another, and even that Houghton had suggested that the defendants send the letters out.  Such findings would not support the degree of substitution of private judgment for public judgment required to convert the escrow defendants' acts into state action.

The second problem with the inducement theory of state action is very real here.  The escrow defendants had every reason to contact the town officials to obtain clarification of state law.  Indeed, Regulation X by its terms required more favorable treatment only if state law permitted it.  It was thus in order to comply with a federal law, Regulation X, that they initiated the contact.  A finding that these private actors were state actors, even if they can arguably be said to have induced the particular statutory interpretations by the state actors, might well chill the exercise of their own rights to communicate with government.  Several circuits have held, and this one has at least hinted, that in view of the First Amendment the courts should avoid an interpretation of § 1983 so broad as to encompass petitions for government action.  See Tarpley v.

-25-

<u>Keistler</u>, 188 F.3d 788, 793-95 (7th Cir. 1999) (collecting cases);[9] <u>cf.</u> <u>Munoz Vargas</u> v. <u>Romero Barcelo</u>, 532 F.2d 765, 766 (1st Cir. 1976) ("[T]here is no remedy . . . against private persons who urge the enactment of laws, regardless of their motives.").

In sum, the inducement theory, acceptable only on extreme facts, requires far more than Tomaiolo has shown. As a matter of law, her claim that the escrow defendants engaged in state action fails.

D.  <u>Pendent State-Law Claims</u>

1.  <u>Supplemental jurisdiction</u>

Once the federal claims were dismissed, it was within the discretion of the district court to exercise supplemental jurisdiction under 28 U.S.C. § 1367 over Tomaiolo's state law claims.  <u>Roche</u>, 81 F.3d at 256-57.  The court did not abuse its

---

[9]   These courts have relied on the Supreme Court's cases of <u>Eastern Railroad Presidents Conference</u> v. <u>Noerr Motor Freight, Inc.</u>, 365 U.S. 127 (1961), and <u>United Mine Workers of America</u> v. <u>Pennington</u>, 381 U.S. 657 (1965), which established what is now commonly referred to as the <u>Noerr</u>-<u>Pennington</u> doctrine.  That doctrine originated in the law of antitrust, but in cases such as <u>Tarpley</u> and its predecessors the courts have extended it to other federal statutes that provide causes of action so broad as potentially to chill the constitutionally protected right to petition the government.

discretion in exercising its jurisdiction over the claims against the escrow defendants. The litigation was far advanced: the court had before it cross-motions for summary judgment, discovery had closed, Tomaiolo had filed her sixth amended complaint, and all claims arose from the same core of facts. That exercise of jurisdiction quite furthered judicial economy. Moreover, we perceive no unfairness: Tomaiolo chose to be in federal court, and once there received ample opportunity to litigate all of her claims, federal and state.

2. <u>State constitutional claims</u>

Tomaiolo asserted that both the municipal defendants and the escrow defendants had violated Article 1, Section 2 of the Constitution of Rhode Island, which provides that:

> The burdens of the state ought to be fairly distributed among its citizens. No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the law.

The first sentence of this section, regarding the burdens of the state, is either judicially unenforceable or else imposes the same constraint as the later reference to equal protection. <u>Town of Lincoln</u> v. <u>City of Pawtucket</u>, 745 A.2d 139, 146 (R.I. 2000). The second sentence incorporates language similar to

-27-

that of the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments to the federal Constitution. In interpreting that sentence, the Rhode Island Supreme Court has noted the similarity and has engaged in a state action inquiry similar to that in Brentwood and Tarkanian. See, e.g., Kleczek v. R.I. Interscholastic League, Inc., 612 A.2d 734, 735-36 (R.I. 1992). The district court therefore correctly concluded that without state action by the escrow defendants, Tomaiolo's state constitutional claim against them could not succeed.

Although the district court did not explicitly discuss the state constitutional claim against the municipal defendants, the logic behind dismissing the federal claims out of deference to the state system would suggest similar deference as to the state constitutional claim. We understand the court to have declined to exercise its jurisdiction over this claim, and approve.

3. State tort claims

We agree with the district court's concise analysis dismissing these claims against the escrow defendants and see no need to add to the discussion. 1st Cir. R. 27.1.

-28-

IV.

We modify the judgment of the district court to dismiss with prejudice all claims for injunctive and declaratory relief as moot, and in all other respects we affirm the judgment of the district court. No costs are awarded.