Smith v. Ayotte, et al.              CV-04-321-JD  02/17/05  P
                  UNITED STATES DISTRICT COURT FOR THE
                         DISTRICT OF NEW HAMPSHIRE


Phillip Smith et al.

        v.                              Civil No. 04-321-JD
                                        Opinion No. 2005 DNH 027
Kelly Ayotte et al.


                              O R D E R


        The defendants, Attorney General Kelly Ayotte and members of

the New Hampshire Board of Tax and Land Appeals (collectively,

the "state defendants") and the towns of Hollis and Hudson, New

Hampshire (collectively, the "town defendants") have moved to

dismiss this action challenging certain aspects of the New

Hampshire property taxation statute embodied in Revised Statutes

Annotated ("RSA") § 74:17.  Both the state defendants and the

town defendants argue that the action is barred by the Tax

Injunction Act, 28 U.S.C. § 1341 ("the TIA").  The town

defendants have moved to dismiss on the additional ground that

the complaint fails to state a claim against them on which relief

can be granted.  The plaintiffs, who own land in the towns of

Hollis and Hudson, have filed an objection to both motions.[1]

---

[1]The plaintiffs have also requested oral argument on the
motions to dismiss.  In support of their request, the plaintiffs
state only that "oral argument would assist this Court in
considering all the issues raised by the Defendants, particularly
those concerning the [TIA].  The oral exchange of arguments
between counsel could clarify how these issues relate to those
claims, RSA § 74:17, and the facts alleged in the complaint."

## Standard of Review

The defendants frame their motions to dismiss on the basis of the TIA as challenges to this court's subject matter jurisdiction. See, e.g., Tomaiolo v. Mallinoff, 281 F.3d 1, 6 (1st Cir. 2002). Where, as here, a defendant questions subject matter jurisdiction without submitting any evidentiary materials, the court accepts all of the plaintiffs' well-pleaded factual allegations as true and draws all reasonable inferences from them in the plaintiffs' favor. Deniz v. Municipality of Guaynabo, 285 F.3d 142, 144 (1st Cir. 2002); Valentin v. Hosp. Bella Vista, 254 F.3d 358, 363 (1st Cir. 2001). The same standard governs the town defendants' motion to dismiss for failure to state a claim. See, e.g., Torres-Viera v. Laboy-Alvarado, 311 F.3d 105, 108 (1st Cir. 2002). Such a motion cannot be granted "[i]f the facts contained in the complaint, viewed in this favorable light, justify recovery under any applicable legal theory . . . ." SEC v. SG Ltd., 265 F.3d 42, 46 (1st Cir. 2001) (citing Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

---

This statement fails to "outline[] the reasons why oral argument may provide assistance to the court" in any meaningful way. Cf. L.R. 7.1(d). The request for oral argument is therefore denied.

<u>Background</u>

New Hampshire charges the selectmen of each town with the responsibility to conduct an annual inventory of "all the estate liable to be taxed" there. RSA 74:1. To assist in this endeavor, the selectman may distribute "inventory blanks" to the owners of such property requiring them to describe it and provide "[o]ther information needed by the assessing officials to assess the taxable property . . . at its true value."[2] RSA 74:4. The selectmen also "may make personal application to any inhabitant of the town . . . for an account of the polls and ratable estate for which they [sic] are liable to be taxed." RSA 74:15.

The selectmen must then assess all taxable property at its market value, considering "all evidence that may be submitted to them relative to the value of the property, the value of which cannot be determined by personal examination." RSA 75:1. Each year, the selectmen must "consider adjusting assessments" for certain classes of property, including those which "[t]hey know or believe have had a material physical change" or "have undergone other changes affecting value." RSA 75:8, II. They must also reappraise all property within the town at least every five years. RSA 75:8-a.

Although no doubt unpopular, as are most tax laws, the

_____

[2]Municipalities may elect not to require their citizens to file inventories. RSA 74:4-a.

3

foregoing provisions have not generated any controversy here.

This action challenges RSA 74:17, which states:

> I.    If the selectmen or assessing officials are unable to obtain consent to enter property for the purpose of obtaining information necessary to complete the inventory under this chapter or appraisal under RSA 75, they may obtain an administrative inspection warrant under RSA 595-B.
>
> II.    Any person who refuses to grant consent to the selectmen or assessing officials for the purposes in paragraph I shall lose the right to appeal any matter pertaining to the property tax for which such person is liable and the right to appeal any exemptions for which such person may be entitled but has not yet received.

RSA 595-B, in turn, authorizes the issuance of an inspection warrant "only upon a showing of probable cause supported by affidavit." RSA 595-B:2, I. Probable cause "shall be deemed to exist" if "legislative or administrative standards for conducting a routine or area inspection . . . are satisfied with respect to a particular place . . . or there is probable cause to believe that a condition of nonconformity exists with respect to the particular place . . . ." RSA 595-B:2, II. It is a misdemeanor knowingly to refuse to permit an inspection lawfully authorized by an administrative warrant. RSA 595-B:8.

Plaintiff Phillip Smith and his wife, Gina, own their home in Hollis. In March 2002, Mrs. Smith was visited there by an inspector hired by the town who "requested to come inside and

4

perform a search" as part of the town's reassessment process.[3] Compl. ¶ 21. Although Mrs. Smith "answered questions the inspector had about the home and allowed him to make exterior measurements," she refused him entrance. Id.

Mr. Smith later sought an abatement of his home's assessed value from the Hollis Board of Selectmen on the ground that his land, but not his house, had been overvalued. See RSA 76:16. This brought another inspector to the Smiths' home to inspect the interior; Mr. Smith refused him entrance. The inspector replied that Mr. Smith "could expect his abatement request to 'fall on deaf ears.'" Compl. ¶ 23. Mr. Smith subsequently received a letter from the Hollis tax assessor's office notifying him that the request had indeed been denied "'due to [his] refusal to allow entry'" to the inspector. Id. ¶ 24.

Mr. Smith then wrote a letter to the state Board of Tax and Land Appeals ("the BTLA"), which hears appeals of local abatement decisions. See RSA 76:16-a. The letter explained that Hollis had denied Mr. Smith's abatement request because he had turned away the inspector and inquired "whether his appeal to the BTLA would also be rejected due to his failure to allow an inspection of his home." Compl. ¶ 25. Mr. Smith received a written

---

[3]Department of Revenue regulations set forth detailed criteria governing the use of private contractors by municipalities to perform assessments. N.H. Code Admin. R. Rev 603 (1997).

response from the BTLA directing him to RSA 74:17 and quoting the statutory provision in full. Id. ¶ 26. The next time the BTLA heard from Mr. Smith, it appears, was this lawsuit.

Plaintiff Anthony Stanizzi and his wife, Christine, also own a home in Hollis where they were visited by inspectors working for the town. Like the Smiths, Mr. Stanizzi rebuffed the inspectors' requests to enter his house during two separate visits. One of the inspectors responded "that the town had authority to obtain a warrant to enter his home if he refused to consent to an interior inspection" and, further, that the refusal would cost Mr. Stanizzi his right to appeal his assessment. Compl. ¶ 28. Undaunted, Mr. Stanizzi subsequently applied to the board of selectmen for an abatement, bringing another inspector to his house several months later. Mr. Stanizzi also refused to allow this inspector into his home, despite another admonition that "his abatement application would probably be denied and that he would lose his right to appeal" as a result. Id. ¶ 30.

Mr. Stanizzi later received a letter from the assessor's office that the board of selectmen had agreed with the inspector's recommendation that they deny Mr. Stanizzi's abatement request due to his refusal to allow an inspection of his property. Compl. ¶ 31. Mr. Stanizzi responded by writing to the BTLA, just as Mr. Smith had. He received the same response and, like Mr. Smith, rejoined with this lawsuit.

6

The remaining plaintiffs, Tony and Alicia Lekas, are a married couple who make their home in Hudson, on property owned by Mr. Lekas. They have received word from the local assessor's office that an inspector will visit the property this summer "and attempt to conduct an interior inspection." Compl. ¶ 35. Although the Lekases "want to cooperate with the town during this process . . . they do not want to be required to let a stranger hired by the town into their home." Id. ¶ 36.

Through this action, the plaintiffs seek declaratory and injunctive relief against the continued application of RSA 74:17, as well as nominal damages against their respective towns, and attorneys' fees. Their complaint presses two theories in support of this relief. First, the plaintiffs contend that RSA 74:17 and RSA 595-B operate in conjunction to violate the Fourth Amendment by allowing the "search" of a home with a warrant procured with "less than traditional probable cause, i.e., without cause to believe the law is being broken" and by coercing consent to search with the prospect of such a warrant. Compl. ¶¶ 42-46. Second, the plaintiffs claim that RSA 74:17, II, places an "unconstitutional condition" on their right to refuse to submit to a warrantless search by costing them their right to seek and appeal an abatement decision if they do so. Id. ¶¶ 50-51. Given that RSA 75:8-a requires each town to reassess the property there at least once every five years, the plaintiffs allege that these violations will reoccur over time.

## Discussion

The TIA provides that "district courts shall not enjoin, suspend, or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Act operates to divest the court of subject matter jurisdiction over all actions within its statutory ambit. See, e.g., California v. Grace Brethren Church, 457 U.S. 393, 408 (1982); Cumberland Farms, Inc. v. Tax Assessor, 116 F.3d 943, 945 (1st Cir. 1997). "It is well settled that allegations of deprivations of constitutional rights do not render the Act inapplicable." Schneider Transport, Inc. v. Cattanach, 657 F.2d 128, 131 (7th Cir. 1981). Here, the parties disagree over the proper scope to be given the TIA in light of a recent Supreme Court decision interpreting it, Hibbs v. Winn, 124 S. Ct. 2276 (2004).

In Hibbs, the Supreme Court determined that the TIA did not bar an action for declaratory and injunctive relief, on the basis of the Establishment Clause, against an Arizona law providing a tax credit for donations to special statutory organizations which could then disburse the funds as scholarships for students attending religious schools. 124 S. Ct. at 2282. The defendant had secured dismissal of the case under the TIA, arguing that "a federal injunction would restrain the 'assessment' of taxes 'under State law.'" Id. at 2282-83. Following reversal by the Ninth Circuit on the ground that "a federal action challenging

8

the granting of a state tax credit is not prohibited by the [TIA]," the Supreme Court granted certiorari "in view of the division of opinion on whether the TIA bars constitutional challenges to state tax credits in federal court." Id. at 2283.

The Court began its analysis by interpreting the term "assessment" as found in the TIA, rejecting the defendant's argument that "'assessment,' by itself, signified the entire plan or scheme fixed upon for charging or taxing." Id. at 2286 (internal quotation marks and brackets omitted). Instead, the Court reasoned that "in § 1341 and tax law generally, an assessment is closely tied to the collection of a tax, i.e., the assessment is the official recording of liability that triggers levy and collection efforts." Id. at 2285-86. The Court therefore concluded that "assessment" must be read as "related . . . to the term's collection-propelling function." Id.

Hibbs also addressed "whether the Act was intended to insulate state tax laws from constitutional challenge in lower federal courts even when the suit would have no negative impact on tax collection." Id. at 2282. To answer this question, the Court first examined the TIA's legislative history, discerning "two closely related, state-revenue-protective objectives": (1) to prevent foreign corporations from circumventing state refund proceedings, "which generally required taxpayers to pay first and litigate later," by invoking federal diversity jurisdiction, and (2) "to stop taxpayers, with the aid of a

9

federal injunction, from withholding large sums, thereby disrupting state government finances." Id. at 2287.

The Court also harmonized its prior jurisprudence holding that the TIA barred federal challenges to state tax laws as uniformly "involv[ing] plaintiffs who mounted federal litigation to avoid paying state taxes (or to gain a refund of such taxes). Federal-court relief, therefore, would have operated to reduce the flow of state tax revenue." Id. at 2288. Rebuffing the defendant's suggestion that both the TIA and prior decisions invoking it prevented "federal-court interference with all aspects of state tax administration," id. (internal quotation marks omitted), the Court noted that it had "interpreted and applied the TIA only in cases Congress wrote the Act to address, i.e., cases in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." Id. at 2289.

The plaintiffs read Hibbs to limit the reach of the TIA to actions through which the plaintiff "is seeking to avoid paying taxes." Resp. at 7. Characterizing their desired remedy as stopping the alleged Fourth Amendment violations attendant to RSA 74:17, rather than relief from property taxes, the plaintiffs argue that this suit does not implicate the concerns behind the TIA because "no tax liability will be avoided either during or after the litigation." Id. at 8.

This argument ignores the effect that the relief sought in this lawsuit would have on the assessment of property taxes in

10

New Hampshire by emphasizing that the plaintiffs have paid their property taxes and do not seek to have them refunded. Although certain language in Hibbs could be taken to suggest that the applicability of the TIA turns on whether the plaintiff himself seeks federal judicial relief against state taxation, this court does not read the case as so narrowing the scope of the Act. Instead, consistent with the lone federal appellate court yet to consider the effect of Hibbs on the TIA, this court believes that "the dispositive question in determining whether the Act's jurisdictional bar applies is whether '[f]ederal court relief . . . would have operated to reduce the flow of state tax revenue.'" May Trucking Co. v. Or. Dep't of Transp., 388 F.3d 1261, 1267 (9th Cir. 2004) (quoting Hibbs, 124 S. Ct. at 2288).

This reading of Hibbs prevails over the plaintiffs' for a number of reasons. First, it recognizes that the case arose as a challenge to the constitutionality of tax credits given to others and therefore could not have relieved the plaintiffs of any tax liability as a logical matter. In such an action, the fact that the plaintiff will not avoid state taxation as a result of the suit necessarily follows from the fact that nobody will; tax revenues will increase if the plaintiff prevails. This court, like the Ninth Circuit in May Trucking, therefore understands Hibbs to turn on the fact that "the suit would have [had] no negative impact on tax collection," 124 S. Ct. at 2282, rather than on the corollary truism that the suit would not have had a

11

negative impact on tax collection from the plaintiffs.

Second, the Court in Hibbs vehemently denied effecting the sea change in TIA jurisprudence that the plaintiffs' reading would necessarily entail. To the contrary, the Hibbs majority viewed its decision as "[c]onsistent with the decades-long understanding prevailing on this issue," i.e., that the TIA erected no barrier against constitutional challenges to tax credits bestowed by state law. Id. at 2291-92. The Court read its prior TIA cases as dependent on the fact that "[f]ederal-court relief . . . would have operated to reduce the flow of state tax revenue," id. at 2288-89, and lower court decisions to turn on "the distinction between taxpayer claims that would reduce state revenues and third-party claims that would enlarge state receipts . . . ." Id. at 2290.

Significantly, the Court expressed no disagreement with existing federal appellate cases finding suits barred by the TIA despite the fact that they did not challenge the plaintiffs' state tax liability, cf. id. at 2290 n. 11, but rather the allegedly unconstitutional actions of state tax officials. See, e.g., Chippewa Trading Co. v. Cox, 365 F.3d 538, 541-42 (6th Cir.) (affirming dismissal of suit challenging forfeiture of untaxed cigarettes with allegedly inadequate notice)[4], cert.

---

[4]The Sixth Circuit issued its opinion in Chippewa Trading after Hibbs was argued, but before it was decided. Although the court in Chippewa Trading relied on principles of federal-state comity in dismissing the suit, Hibbs suggests that such decisions

12

denied, 125 S. Ct. 500 (2004); Brooks v. Nance, 801 F.2d 1237, 1239 (10th Cir. 1986) (holding that TIA barred suit alleging unconstitutional seizure of untaxed cigarettes); Comenout v. Washington, 722 F.2d 574, 578 (9th Cir. 1983) (holding that TIA barred unlawful arrest and assault claims arising out of state tax officials' raid on illegal retail operation).  These decisions held that the TIA precluded the claims in question because they would interfere with states' efforts to enforce their tax laws, which would necessarily reduce their tax revenues.  This court reads Hibbs as consistent with these and like lower court cases which preceded it.[5]  See Linn v. Andover Newton Theological Sch., Inc., 874 F.2d 1, 8 n.9 (1st Cir. 1989) ("we will not lightly presume that the Court intended to overrule, sub silentio, a view held by virtually every circuit to have considered the issue").

Third, the dissenters in Hibbs parted company with the majority primarily for accepting "the premise that the TIA's sole

---

are nevertheless useful in understanding the TIA, which is driven by similar principles.  124 S. Ct. at 2289 n.9; see also Fair Assessment in Real Estate Ass'n, Inc. v. McNary, 454 U.S. 100, 109-110 (1981).

[5]The plaintiffs do not cite to a single lower court case supporting their position.  But see Felton v. Icon Props., 2004 WL 2381513, at *4 (E.D. La. Oct. 22, 2004) (reading Hibbs as "applying the TIA only where a state taxpayer seeks a federal-court order enabling him to avoid paying taxes" and therefore supporting federal jurisdiction over due process challenge to local tax forfeiture procedure).

purpose is to prevent district court orders that would decrease the moneys in state fiscs." 124 S. Ct. at 2297-2300 (Kennedy, J., dissenting). The majority opinion did not accuse the dissent of misunderstanding it in this regard. Cf. id. at 2288 (disagreeing with dissent's interpretation of TIA's legislative and jurisprudential history). This further suggests that the TIA "did not apply to the action brought by the plaintiffs in [Hibbs] because that action, if successful, 'would result in the state's receiving more funds that could be used for the public benefit,'" rather than simply because the plaintiffs themselves were not seeking relief against state taxation. May Trucking, 388 F.3d at 1267 (quoting Hibbs, 124 S. Ct. at 2283).

In accordance with its understanding of Hibbs, then, this court must determine whether the relief sought in this action would staunch the flow of state tax revenue.[6] The plaintiffs request judgment "declaring unconstitutional [RSA] 74:17 on its face" and permanently enjoining the defendants from applying it "to Plaintiffs and those similarly situated." Compl. at 13. Examining the role RSA 74:17 plays within the state taxation framework makes clear that striking down the section would "enjoin, suspend, or restrain" the "assessment" of taxes within the meaning of that term as elucidated by Hibbs.

_____

[6]"State taxation, for § 1341 purposes, includes local taxation." Hibbs, 124 S. Ct. at 2285 n.1.

14

RSA 74:17 enables local tax officials to resort to the state's administrative warrant process only if they cannot "obtain consent to enter property <u>for the purposes of obtaining information necessary</u> to complete" an inventory or appraisal. (Emphasis added.)  Similarly, a taxpayer loses his or her appeal rights only if he or she refuses consent to the officials "to enter property <u>for the purposes in paragraph I</u> . . . ."  RSA 74:17, II (emphasis added).  The values arrived at as a result of the appraisal process become part of the inventory, which in turn provides the basis for the assessment of property taxes.  RSA 74:11; <u>see also</u> 16 Peter J. Loughlin, <u>New Hampshire Practice: Municipal Law and Taxation</u> § 22.01, at 252 (1993) ("real estate in New Hampshire is required to be taxed, and that tax is <u>assessed</u> by the selectmen or assessors in accordance with their <u>appraisal</u> of the property") (footnotes omitted).

Thus, while RSA 74:17 does not itself authorize "the official recording of liability that triggers levy and collection efforts," <u>Hibbs</u>, 124 S. Ct. at 2286, the statute provides a means by which tax officials can obtain information necessary to fix that liability.[7]  Striking down RSA 74:17 would therefore

_____

[7]<u>Hibbs</u> itself noted that "[i]n the property-tax setting, [assessment] usually refers to the process by which the taxing authority assigns a taxable value to real or personal property. To calculate the amount of property taxes owed, the tax assessor multiplies the assessed value by the appropriate tax rate."  124 S. Ct. at 2285 n.3 (citations omitted).

"restrain" the assessment of taxes under state law insofar as it would eliminate the only procedure available to complete inventories or appraisals of property held by taxpayers who do not voluntarily submit to inspections. This, in turn, would reduce the flow of state tax revenue in contravention of the TIA by creating a class of property that could not be assessed at its actual value or, in some cases, inventoried in the first place.[8]

Indeed, the plaintiffs do not dispute that real property often undergoes renovations over time which tend to increase its value. See, e.g., Vickerry Realty Trust v. City of Nashua, 116 N.H. 536, 538 (1976). Depriving taxation officials of the ability to learn of those renovations through the inspection process would therefore lead to a systematic undervaluation of properties and a concomitant reduction in tax revenue. See Blangeres v. Burlington N., Inc., 872 F.2d 327, 328 (9th Cir. 1989) (affirming that TIA barred federal injunction against disclosure of corporation's records which would render states "unable to obtain the information necessary for assessment" of taxes against its employees).

The plaintiffs rejoin that their success in this lawsuit will not foreclose all inspections but simply condition their exercise upon "demonstrating probable cause that a law has been

---

[8]RSA 74:1 itself suggests that property should be valued on the basis of "personal examination" where possible.

16

broken" to obtain an administrative warrant.  Resp. at 8.
Assuming, as the plaintiffs assert, that New Hampshire law lacks
such a requirement,[9] engrafting one onto the statutory scheme
would surely hamstring official efforts to appraise property at
its actual value.  Since Camara v. Mun. Court, 387 U.S. 523
(1967), the Supreme Court has recognized the incompatibility of
the so-called "traditional probable cause" showing with "code
enforcement inspection programs" in which local officials enter
private property to check its compliance with health and safety
regulations.  Id. at 534; see also Marshall v. Barlow's, Inc.,
436 U.S. 307, 320-21 (1978).  Although Camara held that the
Fourth Amendment's warrant requirement generally applied to such
inspections, it rejected the notion "that warrants should issue
only when the inspector possesses probable cause to believe that
a particular dwelling contains violations of the minimum
standards prescribed by the code being enforced."  387 U.S. at
534.  The Court opined that this standard would frustrate the
purposes of code enforcement, reasoning that, inter alia, an
inspector could not as a practical matter decide to examine
certain premises based on his or her knowledge of the conditions
there because many such conditions are simply not observable from
outside the dwelling.  Id. at 536-37.

_____

[9]The court expresses no view on the merits of this or any of
the plaintiffs' claims.  See infra.

17

Likewise, local tax officials often cannot know whether a residence has undergone renovations which have increased its value without entering the residence itself.[10]  This would make it exceedingly difficult to show probable cause that a homeowner has violated state tax law by, for example, failing to include on an inventory blank "information needed by the assessing officials to assess all the taxable property of the person . . . at its true value" in the form of recent renovations in accordance with RSA 74:4, III(b).  Imposing a traditional probable cause requirement onto RSA 74:17 would therefore have consequences similar in kind, if not necessarily degree, to eliminating the statute altogether.  Local officials would, out of simple ignorance, lack the ability to consider value-added renovations in their appraisals, which would in turn result in lower assessments and less tax revenue.

The plaintiffs also argue that their claim for relief from

_____

[10]It is true that the procurement of a building permit for a particular structure serves to notify local officials of construction that would presumably increase the value of the property.  See 16 Loughlin, supra, § 11.05, at 185.  The use of a building permit program in any particular municipality, however, is optional.  RSA 155:A-2, IV.  Furthermore, even those towns that issue building permits can require them of only "any person who intends to erect or remodel any building," RSA 676:11, which may exclude certain types of construction that nevertheless add value to a residence.  Thus, the building permit system available under New Hampshire law does not amount to an effective substitute for the inspection procedures of RSA 74:17.

18

RSA 74:17, II, "has nothing to do with avoiding tax liability" because they are not challenging the statute's effect on their current property assessments but rather its "confronting them with the choice of either submitting to a warrantless and unconstitutional search of their homes or losing their right to appeal." Resp. 8-9. Again, however, whether striking down RSA 74:17, II, would restrain the assessment of state taxes depends on the effect such relief would have on the flow of tax revenue in toto, not merely from the plaintiffs themselves.

Allowing a taxpayer to prevent an inspection of his or her home absent a warrant during the appraisal process and then to challenge the result of that process through abatement proceedings would adversely impact property tax receipts. In considering whether "good cause" exists to grant an abatement under RSA 76:16, the selectmen and, on appeal, the BTLA or the Superior Court, must determine whether the taxpayer's property has been assessed at a higher percentage of fair market value than the percentage at which property is generally assessed in the town. Porter v. Town of Sanbornton, 150 N.H. 363, 368 (2003). For the reasons already stated, correctly ascertaining fair market value would prove difficult in cases where the taxpayer has refused to allow any appraiser to inspect the property on behalf of the municipality, which would tend to

19

result in higher abatements and lower tax revenues.[11]

Because the act of assessment places a lien on the taxpayer's property as a matter of New Hampshire law, RSA 80:19, the pendency of abatement proceedings does not directly affect a municipality's ability to pursue collection of the tax at issue. That fact, however, does not require the conclusion that eliminating RSA 74:17, II, would not restrain the assessment of taxes within the meaning of the TIA. In recently holding that the TIA barred a federal-court challenge to local procedures used in hearing appeals from tax assessments, the Third Circuit rejected the plaintiffs' argument that the fact they paid their taxes prior to appealing the assessments meant that the challenge did not implicate the state's ability to collect taxes. Gass v. County of Allegheny, 371 F.3d 134, 136-37 (3d Cir.), cert. denied, 125 S. Ct. 497 (2004). Here, as in Gass, "[t]he appeal process is directed to the . . . ultimate goal and responsibility of determining the proper amount of tax to assess--a power of 'assessment' that explicitly falls within the ambit of the Tax

---

[11]New Hampshire generally accepts two methods of determining the market value of non-income producing property, such as a house used as a primary residence: the comparable sales approach and the reproduction cost less depreciation approach. See 16 Loughlin, supra, §§ 21.02--21.05. Either approach requires knowledge of the salient aspects of the subject property, which can be definitively ascertained only through inspection. Id.

20

Injunction Act."[12]  Id. at 136-37; see also Tomaiolo, 281 F.3d at 8 ("the procedure by which a state taxpayer may obtain a refund of an allegedly illegally collected tax is no less a part of the smooth functioning of the state's tax system than the collection of the taxes in the first place").

Furthermore, RSA 74:17, II, gives local officials the statutory authority to procure consent to inspect property as part of the inventory or appraisal process by forfeiting the appeal rights of any taxpayer who refuses it.  Stripping officials of that authority would undoubtedly result in the giving of consent in fewer instances; indeed, that is the premise of the plaintiffs' constitutional challenge.  This, in turn, would result in the inspection of fewer residences, particularly if the elimination of RSA 74:17, II, is coupled with the plaintiffs' requested insertion of a "traditional probable cause" requirement into RSA 74:17, I.  As already discussed, fewer residential inspections necessarily translate into lower appraisals and less property tax revenue.  The court therefore concludes that striking down RSA 74:17, II, would restrain the

---

[12]The plaintiffs suggest that Gass conflicts with Hibbs in that the Third Circuit's decision "appears to rest implicitly on the assumption that any federal judicial interference with tax administration is forbidden."  Resp. at 9 n.8.  To the contrary, this court reads Gass as consistent with both the definition of assessment in Hibbs as related to its collection-propelling function and the Court's recognition that applying the TIA depends on whether the remedy sought would reduce tax revenues.

21

assessment of state taxes within the meaning of the TIA.

Finally, the plaintiffs suggest that New Hampshire law fails to provide them with "a plain, speedy and efficient remedy" for the wrongs they allege in this action. Although they concede that "they could have brought their constitutional claims . . . in an action for declaratory and injunctive relief in state court" they dismiss this fact as "irrelevant" because "the relevant inquiry under the TIA is what remedy would be available to a plaintiff in New Hampshire who seeks a refund of his tax (or to otherwise avoid tax liability)." Resp. at 11-12. Because RSA 74:17, II, has cut the plaintiffs off from the state abatement procedures, they contend that they lack any such remedy.

"[A] state court remedy is 'plain, speedy, and efficient' only if it 'provides the taxpayer with a full hearing and judicial determination at which she may raise any and all constitutional objections to the tax.'" Grace Brethren, 457 U.S. at 411 (quoting Rosewell v. LaSalle Nat'l Bank, 450 U.S. 503, 514 (1981) (further internal quotation marks omitted)). By the plaintiffs' own admission, New Hampshire law allows them to mount their Fourth Amendment challenges to RSA 74:17 through a declaratory judgment action. See, e.g., McCann v. Silva, 455 F. Supp. 540, 543 (D.N.H. 1978) (ruling that plaintiff's ability to commence declaratory judgment suit to challenge requirement of filing tax inventory on grounds it violated constitutional right

22

to privacy necessitated dismissal of claim under TIA); <u>Davy v. Dover</u>, 111 N.H. 1, 2-3 (1971) (considering "petition for declaratory judgment brought to test the validity" of local housing ordinance permitting procurement of warrant to inspect property upon owner's refusal).  The plaintiffs do not suggest that such an action is anything but plain, speedy, and efficient.

Instead, the plaintiffs rely on <u>Hibbs</u> for the proposition that the availability of declaratory relief in state court does not satisfy the TIA where it exists independently of a statutory abatement process.  But <u>Hibbs</u> did not create such a rule, and the plaintiffs have provided no other authority for it.  In the passage from <u>Hibbs</u> on which the plaintiffs rely, the Court noted that "[t]he remedy inspected in our decisions was not one designed for the universe of plaintiffs who sue the State. Rather, it was a remedy tailor-made for taxpayers."  124 S. Ct. at 2289.  Read in context, however, this statement simply explains further the Court's conclusion that it had never read the Act as "totally immuniz[ing] from lower federal-court review all aspects of state tax administration."  <u>Id.</u> at 2288-89.

If this view were correct, the Court reasoned, its prior TIA cases would have considered the general availability of state court relief from "tax administration," rather than the sufficiency of state tax refund procedures.  The fact that the Court's TIA jurisprudence had been confined to the latter, then,

23

indicated that it had never construed the Act to apply to a suit imperiling tax refunds instead of tax revenues. Id. at 2289. Thus, the language in question does not bear the plaintiffs' construction, i.e., that only state refund proceedings qualify as "a plain, speedy and efficient remedy" under the TIA.[13] The New Hampshire declaratory judgment procedure clearly provides such a remedy for the plaintiffs' alleged constitutional violations. See Ludwin v. City of Cambridge, 592 F.2d 606, 609 (1st Cir. 1979) (holding that state declaratory judgment action furnished adequate remedy to challenge assessment where plaintiff could not commence state refund proceeding due to inability to pay tax); accord Folio v. City of Clarksburg, 134 F.3d 1211, 1215-16 (4th Cir. 1998) (rejecting argument that state law provided inadequate remedy despite arguably "tenuous" nature of plaintiffs' ability to raise constitutional claims as defense to collection action, given availability of declaratory judgment procedure).

Accordingly, the court concludes that this action falls within the scope of the TIA insofar as it seeks to enjoin, suspend, or restrain the assessment of property taxes under state law, depriving this court of subject matter jurisdiction. The

---

[13]Furthermore, because Hibbs held that a constitutional challenge to a state tax credit could not result in relief that would restrain the assessment of state taxes within the meaning of the TIA, the Court did not reach the question of whether the "special discretionary action" available to attack the credit under state law provided an appropriate remedy.

24

plaintiffs are therefore left to pursue this suit in state court if they so choose. In that regard, the court notes that nothing in this order should be construed as expressing an opinion on the merits of any of the plaintiffs' claims.

<u>Conclusion</u>

For the foregoing reasons, the state defendants' motion to dismiss (document no. 7) and the town defendants' motion to dismiss (document no. 13) are granted on the basis of lack of subject matter jurisdiction. The town defendants' motion to dismiss for failure to state a claim is moot. As noted, the plaintiffs' request for oral argument on the motions (document no. 17) has been denied. The clerk of court shall enter judgment accordingly and close the case.

SO ORDERED.

Joseph A. DiClerico, Jr.
United States District Judge

February 17, 2005

cc:  Scott G. Bullock, Esquire
     Robert W. Gall, Esquire
     Donald E. Gardner, Esquire
     William H. Mellor, Esquire
     Daniel J. Mullen, Esquire
     Curtis E. Payne, Esquire